877 P.2d 806

**ROOSEVELT ELEMENTARY SCHOOL DISTRICT NUMBER 66; Superior Unified School District Number 15; Isaac Elementary School District Number 5; San Carlos Unified School District Number 20; Evangelina Miranda, individually and as a parent of Mariela and George Dorame, minor children, and Manuel Bustamante, individually and as a parent of Gabrielle and Jack Bustamante, minor children, Marco Antonio Ramirez, individually and as a parent of Elizabeth, Mark and Lydia Ramirez, on behalf of themselves and all others similarly situated, Plaintiffs/Appellants,**

v.

**C. Diane BISHOP, Superintendent of Public Instruction, in her official capacity; State Board of Education, State of Arizona, Defendants/Appellees.**

No. CV–93–0168–T/AP.

Supreme Court of Arizona,
En Banc.

July 21, 1994.

Arizona Center for Law in Public Interest by Timothy M. Hogan, Phoenix, and David S. Baron, and Southern AZ Legal Aid, Inc. by William E. Morris, Tucson, for plaintiffs/appellants.

Grant Woods, Atty. Gen. by Anthony B. Ching, Asst. Atty. Gen., Phoenix, for defendants/appellees.

Thomas W. Pickrell and Lewis and Roca by John P. Frank, David J. Cantelme, Mary Ellen Simonson and Richard A. Halloran, Phoenix, for amicus curiae AZ School Boards Ass'n, Inc.

## OPINION

MARTONE, Justice.

■ The question we decide today is whether a statutory financing scheme for public education that is *itself* the cause of gross disparities in school facilities complies with the "general and uniform" requirement of Article XI, § 1 of the Arizona Constitution. We hold that it does not.

This is an action brought by certain school districts and classes of parents against the Superintendent of Public Instruction and the State of Arizona seeking a declaration that the statutory scheme for financing public education in Arizona violates the Arizona Constitution. The districts moved for summary judgment. In opposition, the state argued that it was entitled to summary judgment against the districts and claimed the districts' complaint failed to state a claim upon which relief could be granted. At argument on the districts' motion, the state conceded that it did not controvert the districts' factual submission, and both sides apparently agreed that the only issue before the court was whether the districts or the state were entitled to judgment as a matter of law. Even though the state had not filed a motion for summary judgment, the parties agreed at argument that the court was "to treat this matter as though cross-motions for summary judgment were before [it]." Judgment of September 18, 1992, at 2.

The court observed that the undisputed record showed enormous facility disparities among the various school districts and traced these disparities to the statutory scheme, which relies in large part on local property taxation for public school capital requirements. Nevertheless, the court concluded that, as a matter of law, no claim was stated under the Arizona Constitution. It denied the districts' motion for summary judgment and, in dismissing the districts' complaint, in effect granted the state's unasserted cross-motion for summary judgment.

The districts filed an appeal in the court of appeals and then filed a petition for an order transferring the case to this court. We transferred the case because the issues are of statewide importance, involve a claim that decisions of this court should be overruled or qualified, and require an interpretation of the Arizona Constitution. *See* Rule 19(a), Ariz. R.Civ.App.P. We now reverse the judgment of the superior court and remand the case for entry of judgment in favor of the districts and against the state on the districts' claim for declaratory relief.

## I. THE SETTING

We first describe the undisputed facts and then Arizona's statutory scheme for financing public education.

### A. Facts

The quality of elementary and high school facilities in Arizona varies enormously from district to district. There are disparities in the number of schools, their condition, their age, and the quality of classrooms and equipment. Some districts have schoolhouses that are unsafe, unhealthy, and in violation of building, fire, and safety codes. Some districts use dirt lots for playgrounds. There are schools without libraries, science laboratories, computer rooms, art programs, gymnasiums, and auditoriums. But in other districts, there are schools with indoor swimming pools, a domed stadium, science laboratories, television studios, well stocked libraries, satellite dishes, and extensive computer systems.

The quality of a district's capital facilities is directly proportional to the value of real property within the district. There is wide disparity in assessed valuation per pupil among the school districts in Arizona. Property-rich districts are not necessarily districts in which rich people live. A district with much taxable commercial property, or with a power plant within its boundaries, is property-rich even though its residents may be lower income. For example, the assessed value of the Ruth Fisher Elementary School District approaches $2 billion because the Palo Verde Nuclear Generating Station is located there. As a result, Ruth Fisher Elementary School District has the greatest level of assessed valuation per pupil at $5.8 million. School Management Information Data 1990, Arizona State University, College of Education 75 [hereinafter *School Management*] (based on selected data 1988/89). In contrast, the San Carlos Unified District has an assessed valuation per pupil of $749. *Id.* There is scarcely any commercial property in the San Carlos district because it lies within Gila county, where only 4% of the land is available for commercial or individual use. *Id.* at 15.

A property-poor district with high tax rates may generate less revenue for the capital needs of the district than a property-rich district with low tax rates. For example, in 1989–90, the Roosevelt School District in south Phoenix had a composite tax rate[1] of $4.37 per $100 of assessed value, while the Ruth Fisher School District had a tax rate of $.11 per $100 of assessed value. *Id.* at 76.

Even if the commercial property in districts is comparable, demographic factors such as income and student population will cause disparities. For example, the Madison Elementary School District and the Roosevelt Elementary School District have similar distributions of commercial and residential property. But Madison is located in north central Phoenix and is largely middle income while Roosevelt is located in south Phoenix and is largely lower income. Residential property values differ significantly, which is a cause of the large property value disparity: $526 million for Madison compared to $195 million for Roosevelt. Moreover, Roosevelt has more students. Thus, Madison's assessed value per pupil is $130,778 while Roosevelt's assessed value per pupil is only $18,293. *School Management* at 29; *see also* Affidavit of Sid Borcher at 4.

The Superintendent of Public Instruction admits that there is a "sense of . . . bareness about some of the facilities in the poorer districts, that they are minimal. . . . It is basically four walls, a roof, and classroom inside, and that's about the extent of it." Deposition of Diane Bishop at 16. She acknowledges that the state budget is insufficient for the capital needs of many school districts, *id.* at 33–34, and that a district's property value largely determines its ability to construct new buildings and to buy computers and textbooks. *Id.* at 34. The Superintendent agrees that the quality of education a child receives in Arizona should not depend on whether the child lives in a wealthy or poor school district. *Id.* at 38. Indeed, the Superintendent "think[s] education is a state responsibility and that all children of the state have the same rights to education." *Id.*

### B. *The Statutory Scheme for Public School Financing*

The Arizona education statutes reflect the complexity of the underlying system. *See* A.R.S. §§ 15–101 to –1901. The statutes assign tasks to the state and delegate others to the counties and local school districts. School districts, political subdivisions of the state with geographic boundaries, are organized to administer, support and maintain public schools. A.R.S. § 15–101(15). The statutes accommodate pre-statehood districts, A.R.S. § 15–441(A), new districts, § 15–443, and allow for changes in district boundaries. § 15–460.

The financing scheme is particularly complex. *See* A.R.S. §§ 15–901 to –1241. If lack

---

1. A composite tax rate is the sum of the primary and secondary tax rates, to be applied to each $100 of assessed valuation. Primary taxes support schools and government needs; secondary taxes support bond issues, override elections, and special districts. *See School Management* at 3.

of clarity alone were sufficient to strike these statutes down, this case would be less difficult. We are fortunate, however, that the parties share a common understanding of how Arizona's public schools are financed.

The statutes create an educational funding formula. First, each district's base-level funding needs are determined by multiplying the number of students in the district by an arbitrary, state-wide dollar amount per pupil. A.R.S. § 15–943. The per-pupil amount appears to be unrelated to any minimum amount necessary for a basic education.[2]

The formula then determines the districts' share of the base level. The required contribution by a district is derived by multiplying the district's total assessed property value by an arbitrary dollar figure that each district is expected to collect from property taxes. A.R.S. § 15–971(D). If a district's required contribution falls short of the predetermined base level, the state makes up the difference. *Id.* If the district's expected contribution exceeds the base level, the district is not entitled to any state "equalization assistance." *Id.*

Finally, any funding in excess of the equalized level must be raised through bonded indebtedness by the individual districts. These bonds are subject to voter approval because they must be repaid by increased property taxes. "Since bonds are outside the funding formula, a district's ability to pass bonds is based purely on property wealth and taxpayer willingness." The Joint Legislative Budget Committee's Staff, *K–12 Funding Formula Examples and Descriptions* 11 (1993). The amount of bonded indebtedness that a district may incur, however, is limited

by its total assessed property valuation. A.R.S. § 15–1021.

Under the formula, the cost of public education is allocated as follows: the state (45%), local districts (45%), and the United States and counties collectively (10%). Ninety per cent of Arizona's school districts receive some equalization assistance. But the true amount of funding is based upon the value of a district's property and its ability and willingness to tax it. Each district must raise the arbitrary required contribution and must fund anything over the equalization base with added taxes. Property value is therefore crucial to a district's ability to fund its schools.

The system has a particularly profound effect on capital needs. Although each district's equalization level includes a budgeted amount for capital improvements, a district may use most of these funds for maintenance and operations if the budgeted maintenance and operations funds are inadequate. *See* A.R.S. § 15–905(F). If a district repeatedly uses its capital funds for maintenance and operations, its facilities will deteriorate unless the district can generate revenue through bonding. Severe facilities deterioration is therefore likely to occur if the funding formula's equalization level is low and the district has low property value.[3] Moreover, the funding system has different effects on individual school districts that inevitably emerge as disparities in capital facilities. Thus, the statutory effort at equalization, although well motivated, predictably fails.

## II. THE STATE CONSTITUTIONAL ARGUMENTS

The districts launch two separate state constitutional arguments to support their

2. The calculation is tremendously complicated. Even the student count is subject to weighing factors so the funding needs of special students are factored into the final count. However, we cannot find anything in the statutory scheme that addresses the actual cost of providing a basic education. Instead, the foundation amount for education appears to be derived from each district's 1979–1980 budget. See A.R.S. § 15–944.

3. The public school financing system is separated into two categories: the capital financing scheme and the maintenance and operations financing scheme. The districts' claim attacks the capital

financing scheme exclusively. But we find that capital disparities are caused by the entire financing system, not just the capital side of the equation. Because districts have the power to use budgeted capital funds for maintenance and operations, the two sides are interrelated. Moreover, the districts must rely, to some extent, on property tax based funding for both capital *and* maintenance and operations. We find that the capital disparities here are simply the first symptoms of a system-wide problem. It would therefore be both artificial and ineffective for us to limit our review to capital financing.

claim that the Arizona school finance system is unconstitutional.

## A. *Equal Protection Argument*

*San Antonio School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), forecloses an argument based upon the federal equal protection clause. The Court held that, because education was nowhere to be found in the United States Constitution, it was not a fundamental right. Thus, the Court applied the rational basis test, and not the compelling state interest test, to judge the constitutionality of a state property tax based educational scheme.

Unlike the United States Constitution, education is the subject of an entire article of the Arizona Constitution. Ariz. Const. art. XI. From this, the districts argue that education is a fundamental right and the school finance system violates the state equal protection clause (the privileges or immunities clause) because it discriminates against children and denies them equal educational opportunities because of where they live.

The privileges or immunities clause of Arizona's Constitution provides:

> No law shall be enacted granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations.

Ariz. Const. art. II, § 13.

The districts argue that the state has failed to show a compelling state interest to justify its reliance upon a largely property tax based school finance scheme. In response, the state claims that the districts' privileges and immunities argument is foreclosed by this court's decision in *Shofstall v. Hollins,* 110 Ariz. 88, 515 P.2d 590 (1973), which acknowledged education as a fundamental right but then upheld the then-existing school financing scheme using the rational basis test.

■ We agree with the districts that *Shofstall* is not dispositive. We do not understand how the rational basis test can be used

when a fundamental right has been implicated. They seem to us to be mutually exclusive. If education is a fundamental right, the compelling state interest test (strict scrutiny) ought to apply. *Kenyon v. Hammer,* 142 Ariz. 69, 83, 688 P.2d 961, 975 (1984). On the other hand, if the rational basis test properly applies, education is not a fundamental right.

We need not, however, resolve this conundrum because where the constitution specifically addresses the particular subject at issue, we must address that specific provision first. *Albright v. Oliver,* — U.S. —, —, 114 S.Ct. 807, 813, 127 L.Ed.2d 114 (1994) ("Where a particular amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' *must* be the guide for analyzing these claims.'" (quoting *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989))) (emphasis added).[4] We need not resort to the less specific provision unless the argument based upon the more specific fails. The districts' challenge focuses on the public school system. The education provisions of the constitution are more specific than the privileges and immunities provision. By relying on the specific rather than the general, we also avoid the difficult questions and uncharted territory that surround equal protection and other governmental functions. See *Rodriguez,* 411 U.S. at 54, 93 S.Ct. at 1307. We therefore begin with those portions of our constitution that specifically address the field of education.

## B. *The Education Provisions of the Arizona Constitution*

### 1. Historical Background

Arizona's approach to education, with roles shared among the state, counties, and school districts, predates our constitution. Territorial law established a territorial tax, a county tax, and a school district tax to support public education. Revised Statutes of the Territory of Arizona Title XX, chs. 14 and 15

---

4. This principle promotes an important prudential purpose which would not be served by taking

the "final step" advanced by the concurring opinion. *Post,* at 244, 877 P.2d at 817.

(1887); Revised Statutes of the Territory of Arizona Title XIX, chs. 14 and 15 (1901).

Arizona's enabling act imposed certain conditions to its admission to the United States. Arizona was required to adopt a constitution with provisions "for the establishment and maintenance of a system of public schools which shall be open to all the children of said State...." Act of June 20, 1910, ch. 310, § 20, 36 Stat. 557, 570 [hereinafter *Act*]. Federal lands were granted to the state "for the support of common schools." *Act* § 24 at 572. Section 25 made outright land grants for specific educational purposes. Excess granted land would become part of the permanent school fund of the state, the income from which could only be used for the maintenance of the common schools. The schools were to be forever under the *exclusive* control of the state, *Act* § 26 at 573, and a portion of the proceeds of the sale of public lands by the United States after admission were to be paid to the state to create a fund, "the interest of which only shall be expended for the support of the common schools within said State." *Act* § 27 at 574.

Article XI of our constitution is the product of the conventioneers' efforts to fulfill the promise of the enabling act and is largely the work of the convention's committee on education. *The Records of the Arizona Constitutional Convention of 1910*, 1068 (John S. Goff, ed., 1991) [hereinafter *Records*]. The proposed drafts of the article, *id.* at 1064, 1069, as well as the discussion of the committee of the whole, *id.* at 523–38, 945–47, show that the conventioneers satisfied the enabling act by adopting a basic structure for Arizona's educational system that resembled the territorial regime with which they were already familiar. Not surprisingly, the first legislature after statehood enacted an education title that provided for state taxing, county taxing, and taxing for capital improvements through school district bonded indebtedness. Revised Statutes of Arizona, Civil Code, §§ 2815–24, §§ 2864–65 (1913).

The conventioneers believed that an educated citizenry was extraordinarily important to the new state. Early drafts of the education article began with "[a] general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people ...," *id.* at 1069, and "[t]he stability of a Republican form of Government depending mainly on the intelligence of the people...." *Id.* at 1064.[5] The conventioneers believed these were more than mere words. By 1910, they had witnessed the most intense immigration in the history of America. They were keenly aware that education was responsible for preserving America's unity while wave after wave of peoples arrived from other countries. As the heated debates about education as a requirement for voting show, the conventioneers believed that a free society could not exist without educated participants. *See Records* at 564–69.

### 2. The Operative Provisions of Article XI

Article XI, § 1 of the Arizona Constitution provides as follows:

> The Legislature shall enact such laws as shall provide for the establishment and maintenance of a *general and uniform* public school system, which system shall include kindergarten schools, common schools, high schools, normal schools, industrial schools, and a university....

(Emphasis Added.) The article expressly addresses school finance. Section 8 establishes a permanent state school fund derived from a variety of sources, the income from which may be used "only for common and high school education in Arizona." Under § 9, the apportionment under § 8 becomes part of a county school fund and the legislature "shall enact such laws as will provide for increasing the county fund sufficiently to maintain all the public schools of the county for a minimum term of six months in every school year." Section 9 also provides that the laws of the state shall allow the cities and towns to maintain free high schools. Finally, § 10 provides:

> The revenue for the maintenance of the respective State educational institutions

---

5. These suggested clauses were rejected at the last minute. Some of the conventioneers were concerned that the clauses sounded too much like "a good old fashioned Democratic speech." *Records* at 523.

shall be derived from the investment of the proceeds of the sale, and from the rental of such lands as have been set aside by the Enabling Act approved June 20, 1910, or other legislative enactment of the United States, for the use and benefit of the respective State educational institutions. In addition to such income the Legislature shall make such appropriations, to be met by taxation, as shall ensure the proper maintenance of all State educational institutions, and shall make such special appropriations as shall provide for their development and improvement.

From these provisions, the districts argue that the legislature must establish and maintain a general and uniform public school system and finance it by general and special appropriation. The districts do not quarrel with the proposition that the state may choose a financing scheme that relies in part on property taxation; but if it does so, it must ensure that by appropriation, or by the definition of district, the financing scheme is general and uniform in fact.

In response, the state argues that Arizona's public school system is not within the scope of art. XI, § 10 at all. It claims that funding a general and uniform school system is therefore not the state's responsibility but the responsibility of school districts. The state further asserts that, even if we were to hold that the state is responsible for such a system, "general and uniform" is formal and not substantive. Relying again on *Shofstall*, the state argues that as long as the framework of the system is general and uniform, the substance of that system need not be.

### 3. The State's Responsibility

■ We first deal with the state's argument that the financing of public education in Arizona is the responsibility of school districts and not the state. We believe that this

proposition is directly refuted by art. XI itself. We look in vain for any provision in the article that imposes any responsibility on school districts to fund public education. The only sources mentioned are the state and the counties. *See* §§ 8, 9, and 10. The enabling act imposed upon the state the responsibility to create and exclusively control a public school system. Moreover, art. XI, § 1 makes it quite clear that the legislature must enact laws that establish and maintain the public school system. Discretion is left to the legislature as to how it does so, but it must do so.

■ It is true that nothing in art. XI prohibits the legislature from delegating some of its *authority* to other political subdivisions of the state to help finance public education. But there is nothing in art. XI, § 1 that allows the state to delegate its *responsibility* under the constitution. Although the legislature may rely on school districts, counties and the state, the result must produce a general and uniform financing scheme. Because the duty under art. XI, § 1 is a state responsibility, it does not matter whether public schools are within the scope of art. XI, § 10.[6]

### 4. The "General and Uniform" Clause

*Shofstall* acknowledged that art. XI, § 1 requires a general and uniform public school system, but then defined uniformity by reference to compliance with *other* sections of article XI. For example, § 6 requires the schools to be open at least 6 months each year for pupils between the ages of 6 and 21. *Shofstall* also defined uniformity by reference to *statutes* which set up a framework for required courses, teacher qualification and the like.

But *Shofstall*'s reference to other sections of article XI renders most of § 1 meaningless and redundant. If § 1 has independent sig-

---

**6.** The state argues that the "State educational institutions" referred to in § 10 do not include common schools or high schools. This is a possible interpretation when art. XI, the enabling act, and the minutes of the constitutional convention are compared and contrasted. However, the districts accurately point out that we have held, on two different occasions, that "State educational institutions" as appearing in art. XI, § 6

includes high schools. *See Carpio v. Tucson High School Dist. No. 1*, 111 Ariz. 127, 128, 524 P.2d 948, 949 (1974); *Estate of Arizona Southwest Bank*, 41 Ariz. 507, 512, 19 P.2d 1063, 1065 (1933). The clause in § 10 should therefore be read consistently with the clause in § 6. Nevertheless, the state's responsibility for funding undoubtedly springs from § 1.

nificance, and it must, how does compliance with § 6 satisfy § 1? And how can the substantive content of the meaning of the constitution (general and uniform) be defined by reference to statutes? Our reading of the constitution, the enabling act and the proceedings of the constitutional convention leads us to the conclusion that "general and uniform" means far more than framework.

But what then is a general and uniform public school system? After *Rodriguez* disposed of the federal equal protection argument, school funding challenges occurred among the states under state constitutions. This was natural enough because, while education is absent from the federal constitution, it is present in state constitutions. Its presence not only formed the basis for state equal protection claims, but also independent claims under education provisions themselves. Because the language in each of the state constitutions varies, the holdings construing them are without unity.

Some have struck down their financing systems. *Dupree v. Alma Sch. Dist. No. 30,* 279 Ark. 340, 651 S.W.2d 90 (1983); *Serrano v. Priest,* 18 Cal.3d 728, 135 Cal.Rptr. 345, 557 P.2d 929 (1976) (*Serrano II* ), cert. denied, 432 U.S. 907, 97 S.Ct. 2951, 53 L.Ed.2d 1079 (1977); *Horton v. Meskill,* 172 Conn. 615, 376 A.2d 359 (1977); *Rose v. Council for Better Educ.,* 790 S.W.2d 186 (Ky.1989); *McDuffy v. Sec. of Exec. Off. of Educ.,* 415 Mass. 545, 615 N.E.2d 516 (1993); *Helena Elementary Sch. Dist. No. 1 v. State,* 236 Mont. 44, 769 P.2d 684 (1989); *Robinson v. Cahill,* 62 N.J. 473, 303 A.2d 273, cert. denied, 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973); (*Robinson I* ); *Edgewood Indep. Sch. Dist. v. Kirby,* 777 S.W.2d 391 (Tex. 1989); *Seattle Sch. Dist. v. State,* 90 Wash.2d 476, 585 P.2d 71 (1978); *Pauley v. Kelly,* 162 W.Va. 672, 255 S.E.2d 859 (1979); *Washakie County School Dist. No. 1 v. Herschler,* 606 P.2d 310 (Wyo.), cert. denied, 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980).

Others have upheld their financing systems. *Lujan v. Colorado State Bd. of Educ.,* 649 P.2d 1005 (1982); *McDaniel v. Thomas,* 248 Ga. 632, 285 S.E.2d 156 (1981); *Thompson v. Engelking,* 96 Idaho 793, 537 P.2d 635 (1975); *People ex rel. Jones v. Adams,* 40 Ill.App.3d 189, 350 N.E.2d 767 (1976); *Knowles v. State Bd. of Educ.,* 219 Kan. 271, 547 P.2d 699 (1976); *Hornbeck v. Somerset County Bd. of Educ.,* 295 Md. 597, 458 A.2d 758 (1983); *Milliken v. Green,* 390 Mich. 389, 212 N.W.2d 711 (1973); *Skeen v. State of Minnesota,* 505 N.W.2d 299 (Minn.1993); *Gould v. Orr,* 244 Neb. 163, 506 N.W.2d 349 (1993); *Bd. of Educ. Levittown v. Nyquist,* 57 N.Y.2d 27, 453 N.Y.S.2d 643, 439 N.E.2d 359 (1982), appeal dismissed, 459 U.S. 1138, 1139, 103 S.Ct. 775, 74 L.Ed.2d 986 (1993); *Bd. of Educ. of Cincinnati v. Walter,* 58 Ohio St.2d 368, 12 O.O.3d 327, 390 N.E.2d 813 (1979), cert. denied, 444 U.S. 1015, 100 S.Ct. 665, 62 L.Ed.2d 644 (1980); *Fair Sch. Finance Council of Okla. v. State,* 746 P.2d 1135 (Okla.1987); *Olsen v. State,* 276 Or. 9, 554 P.2d 139 (1976); *Danson v. Casey,* 484 Pa. 415, 399 A.2d 360 (1979); *Richland County v. Campbell,* 294 S.C. 346, 364 S.E.2d 470 (1988); *Kukor v. Grover,* 148 Wis.2d 469, 436 N.W.2d 568 (1989).

In our effort to define "general and uniform," we distill two fundamental principles from these cases. First, units in "general and uniform" state systems need not be exactly the same, identical, or equal. Funding mechanisms that provide sufficient funds to educate children on substantially equal terms tend to satisfy the general and uniform requirement. School financing systems which themselves create gross disparities are not general and uniform.

■ The second principle relates to the tension that exists between the competing values of local control and statewide standards. As long as the statewide system provides an adequate[7] education, and is not

---

7. Although it seems intuitive that there is a relationship between the adequacy of education and the adequacy of capital facilities, the districts chose not to plead or prove such a relationship. The state claimed that this omission was fatal to the districts' case, but the districts argued that such a relationship, although intuitive, was not relevant to or essential to their claim.

We agree with the districts. Even if every student in every district were getting an adequate education, gross facility disparities caused by the state's chosen financing scheme would violate the uniformity clause. Satisfaction of the sub-

itself the cause of substantial disparities, local political subdivisions can go above and beyond the statewide system. Disparities caused by local control do not run afoul of the state constitution because there is nothing in art. XI that would prohibit a school district or a county from deciding for itself that it wants an educational system that is even better than the general and uniform system created by the state.

Local control in these matters is an important part of our culture. Thus, school houses, school districts, and counties will not always be the same because some districts may either attach greater importance to education or have more wherewithal to fund it. Nothing in our constitution prohibits this. Factors such as parental influence, family involvement, a free market economy, and housing patterns are beyond the reach of the "uniformity" required by art. XI, § 1.[8] Indeed, if citizens were not free to go above and beyond the state financed system to produce a school system that meets their needs, public education statewide would suffer. Those who could might opt out of the system for private education. There could be political pressure to fund the public school system at a level adequate enough to comply with the constitution, but insufficiently adequate to achieve academic excellence.

■ Political subdivisions of the state, such as districts and counties, are therefore free to go above and beyond the system provided by the state. It is thus not the existence of disparities between or among districts that results in a constitutional violation. The critical issue is whether those disparities are the result of the financing scheme the state chooses.

■ In short, the system the legislature chooses to fund the public schools must not itself be the cause of substantial disparities. There is nothing unconstitutional about relying on a property tax. There is nothing unconstitutional about creating school districts. But if together they produce a public school system that cannot be said to be general and uniform throughout the state, then the laws chosen by the legislature to implement its constitutional obligation under art. XI, § 1 fail in their purpose.

This is not a case in which capital facility disparities are the result of districts going above and beyond the state financing scheme. Here, the districts claim that the statutory financing system is itself the cause of the disparities. And on these undisputed facts, the state concedes that the enormous disparities among school districts are the direct result of the state's financing scheme. The scheme is a combination of heavy reliance on local property taxation, arbitrary school district boundaries, and only partial attempts at equalization.

Here, the state knew of the profound differences in property value among the districts, yet selected a funding mechanism where 45% of the revenue depends upon property value. Thus, the state's financing scheme could do nothing but produce disparities. The statutes are inherently incapable of achieving their constitutional purpose. Because the state's financing system is itself the cause of these disparities, the system, taken as a whole, does not comply with art. XI, § 1 of the Arizona Constitution.

■ We therefore hold that the present system for financing public schools does not satisfy the constitutional mandate of a gener-

stantive education requirement does not necessarily satisfy the uniformity requirement, just as satisfaction of the uniformity requirement does not necessarily satisfy the substantive education requirement. In contrast to the view expressed in the concurring opinion, *post*, at 246, 877 P.2d at 819, this case affords us no opportunity to define adequacy of education or minimum standards under the constitution. While we agree that uniformity is but a *necessary* and not a *sufficient* condition under art. 11, § 1, the contours of sufficiency are simply not before us.

8. Indeed, James Coleman and other sociologists have concluded that socioeconomic background is the most powerful predictor of student performance; it is all in the "quality of the homes from which the students come." George F. Will, *Look to Family to Find Signs of School's Success*, The Arizona Republic, Feb. 18, 1994, at B5; *see also* James Traub, *Can Separate Be Equal?*, Harper's, June 1994, 36, 44 ("it is undeniable that neither desegregation nor school reform, nor financing, nor any intervention, weighs very heavily in determining academic outcomes compared with a student's socioeconomic status").

al and uniform school system. We emphasize that a general and uniform school system does not require perfect equality or identity. For example, a system that acknowledges special needs would not run afoul of the uniformity clause. We also emphasize that disparities that are not the result of the state's own financing scheme do not implicate the interests sought to be served by art. XI, § 1.

As the conventioneers who drafted Arizona's constitution foresaw, public education has been a key to America's success. The education provisions of the constitution acknowledge that an enlightened citizenry is critical to the existence of free institutions, limited government, economic and personal liberty, and individual responsibility. Financing a general and uniform public school system is in our collective self-interest.

## III. RELIEF

This case comes to us in an unusual posture. The state conceded the existence of substantial disparities among the districts and a causal relationship between these disparities and the statutory scheme. The court below, therefore, erred in granting summary judgment in favor of the state, and instead should have granted summary judgment in favor of the districts. While injunctive relief is inappropriate at this time, the districts are entitled to a declaration that the existing statutory scheme for the financing of public schools in Arizona fails to comply with art. XI, § 1 because it is itself the source of substantial nonuniformities. There are doubtless many ways to create a school financing system that complies with the constitution. As the representatives of the people, it is up to the legislature to choose the methods and combinations of methods from among the many that are available.[9] Other states have already done so.

We therefore reverse the judgment of the superior court and remand the case for entry of judgment declaring that art. XI, § 1 of the Arizona Constitution requires the legislature to enact appropriate laws to finance edu-

cation in the public schools in a way that does not itself create substantial disparities among schools, communities or districts. Because the present scheme is the source of these disparities, it is not in compliance with art. XI, § 1. The trial court shall retain jurisdiction to determine whether, within a reasonable time, legislative action has been taken.

ZLAKET, J., concurs.

FELDMAN, Chief Justice, specially concurring.

I concur in the result summarized in the first paragraph of Justice Martone's opinion (the "opinion"): When the legislature enacts "a statutory financing scheme for public education that is *itself* the cause of gross disparities in school facilities," that scheme does not comply "with the 'general and uniform' requirement of Article XI, § 1 of the Arizona Constitution." I thus join in Sections I through II(B)(3) of the opinion.

I write separately for two reasons. First, I believe our constitution's equal protection clause fully resolves this case. *See* Ariz. Const. art. 2, § 13. Second, I cannot agree with Section II(B)(4), which characterizes and applies the general and uniform mandate of Ariz. Const. art. 11, § 1. I turn first to equal protection.

### A. EQUAL PROTECTION

As the opinion notes, in *San Antonio School District v. Rodriguez,* the United States Supreme Court held that education is not a fundamental *federal* constitutional right. Maj. op. at 237–238, 877 P.2d at 810–811 (citing 411 U.S. 1, 37, 93 S.Ct. 1278, 1299, 36 L.Ed.2d 16 (1973)). Building on that principle, in *Shofstall v. Hollins,* 110 Ariz. 88, 515 P.2d 590 (1973), this court cited *San Antonio* to support its view that Arizona's school financing system does not violate Ariz. Const. art. 2, § 13, which provides in relevant part: "No law shall be enacted granting to any citizen [or] class of citizens ... privileges ... which, upon the same terms, shall not equally

---

9. We note that there is significant public support for reform and that the Governor, the Superintendent of Public Instruction, and some legisla-

tors have attempted to take up the challenge. *Education Finance: What a Mess,* The Arizona Republic, Feb. 22, 1994, at B8.

belong to all citizens...." A financing system "which has a *rational and reasonable basis* and which meets the educational mandate of our constitution[1] should ... be upheld." *Id.* at 90–91, 515 P.2d at 592–93 (emphasis added).

As Justice Martone correctly observes, the conclusion in *San Antonio* rested, in large part, on the fact that the federal constitution does not mention, let alone guarantee, the right to an education. When confronted with the federal equal protection challenge in *San Antonio,* the United States Supreme Court therefore analyzed the admittedly unequal and unbalanced Texas school financing system under the lenient rational basis test, instead of applying the strict scrutiny standard reserved for a fundamental right.

The Arizona Constitution, however, explicitly guarantees an education, providing that "State educational institutions shall be open to students of both sexes, and the instruction furnished shall be as nearly free as possible." Ariz. Const. art. 11, § 6. This provision ensures access to kindergartens, common schools, and high schools as well as institutions such as the universities. *See Carpio v. Tucson High Sch. Dist. No. 1,* 111 Ariz. 127, 524 P.2d 948 (1974). Our constitution also compels the legislature to provide common schools that "shall be open to all pupils between the ages of six and twenty-one years." Ariz. Const. art. 11, § 6.

Assuming our constitutional framers sought substance and not mere form, Arizona's children have the right to receive a free, public, basic education through high school. *Shofstall,* 110 Ariz. at 90, 515 P.2d at 592. Thus, there is no need to seek rights in the Arizona Constitution's penumbra—specific guarantees establish "education as a *fundamental right." Id.* (emphasis added). Having said this much, inexplicably, and without analysis, *Shofstall* applied a rational basis test to determine the constitutionality of the school financing scheme under Arizona's equal protection clause.

Both the United States Supreme Court and this court have repeatedly held, however,

that courts must apply a strict scrutiny analysis to fundamental rights and uphold challenged laws *only* if the inequality resulting from their application is essential to serve a compelling state interest. *San Antonio,* 411 U.S. at 40, 93 S.Ct. at 1300; *see also Big D Const. Corp. v. Court of Appeals,* 163 Ariz. 560, 566, 789 P.2d 1061, 1067 (1990); *Kenyon v. Hammer,* 142 Ariz. 69, 79, 688 P.2d 961, 971 (1984) ("If [a] right is 'fundamental,' *the strict scrutiny analysis must be applied"*) (emphasis added); *Arizona Downs v. Arizona Horsemen's Found.,* 130 Ariz. 550, 556, 637 P.2d 1053, 1059 (1981) (same).

The state has cited no compelling state interest in a school financing scheme that inescapably creates gross disparities in capital facilities. Although we recognize a valid state interest in local or school district control of education, the state does not tell us why its financing scheme for capital facilities must necessarily hinge so heavily on the property wealth of the individual districts, without providing for equalization or adopting one of the many other methods available for preventing gross disparity. The state could hardly claim such a system is necessary in light of the methods it has adopted to equalize operating expenditures between school districts. The bottom line is simply this: the current method of financing capital facilities and equipment *both* ensures gross disparities *and* fails the strict scrutiny test. *See Serrano v. Priest,* 5 Cal.3d 584, 96 Cal. Rptr. 601, 487 P.2d 1241, 1260 (1971). Accepting, as I do, the idea that local control of education through local school districts *is* a compelling state interest, there is simply no reason that laws creating gross inequality in financing capital facilities between districts are *necessary* to achieve local control. *Id.* 96 Cal.Rptr. at 622, 487 P.2d at 1262.

We rejected *Serrano* in *Shofstall,* not because we disagreed with the conclusion that our school financing system could not pass strict scrutiny but because we applied the rational basis analysis. Applying the proper strict scrutiny analysis, a financing scheme such as Arizona's must fail. *Id.* 96 Cal.Rptr.

---

1. *Shofstall* implied, of course, that a system that "meets the educational requirements of our constitution" would have to be *"uniform,* free, available ... [and] *rational, reasonable and neither discriminatory nor capricious."* 110 Ariz. at 90, 515 P.2d at 592 (emphasis added).

at 615–21, 487 P.2d at 1255–60; *see also Milliken v. Green*, 389 Mich. 1, 203 N.W.2d 457, 470–71 (1972); Jeffrey H. Schwartz, *Public School Financing Cases: Interdistrict Inequalities and Wealth Discrimination*, 14 ARIZ.L.REV. 88, 122 (1972); Ferdinand P. Schoettle, *The Equal Protection Clause in Public Education*, 71 CoLUM.L.REV. 1355, 1401 (1971).

Thus, I join Justice Martone's view "that *Shofstall* is not dispositive" on the equal protection question. Maj. op. at 237, 877 P.2d at 811. I too "do not understand how the rational basis test can be used when a fundamental right has been implicated. If education is a fundamental right [as it is in our constitution and as we held in *Shofstall* ], the compelling state interest test (strict scrutiny) ought to apply." *Id.* (citing *Kenyon*, 142 Ariz. at 83, 688 P.2d at 975).

Unlike Justice Martone, however, I would take the final step and resolve this conundrum. Maj. op. at 237, 877 P.2d at 811.[2] The existing statutory scheme for financing public school facilities—office and classroom space; libraries, gymnasia, and support facilities; text and library books; computer, laboratory, and other educational equipment— violates the equal protection clause of the Arizona Constitution. It grants to one group, students who live in affluent school districts, the privilege of access to public schools containing basic facilities and equipment, thus affording them an opportunity to obtain the minimum education that we recognized in *Shofstall* as their right. At the same time, it deprives another group, students residing in property-poor districts, of an *equal opportunity* by forcing them to use substandard facilities and equipment. As all concede, on this record there is no question that such a disparity in facilities and equipment exists.

This is not to say that equal protection requires the same education for each student, or that each school district must provide identical or equal facilities. It means only that the Arizona Constitution guarantees a basic right to educational opportunity—the right to be provided with the "opportunity to compete successfully in the economic marketplace, to develop as a citizen, and to become a self-reliant individual." Schwartz, 14 ARIZ.L.REV. at 122; *see also Shofstall*, 110 Ariz. at 90, 515 P.2d at 592. *Serrano* makes it clear that the equal protection clause prevents a state from making the quality of a child's basic educational opportunity a function of the wealth of the district in which the pupil resides. 96 Cal.Rptr. at 625, 487 P.2d at 1265.

I conclude that because the facilities financing scheme works a gross disparity in financing basic educational facilities and equipment, and is not necessary to serve the compelling state interest in preserving local control, it violates Ariz. Const. art. 2, § 13.

**B. RESOLVING THE CASE UNDER THE EDUCATION ARTICLE**

The opinion prefers, however, to analyze this case under Ariz. Const. art. 11—the education article. I do not object to the routing, although I doubt its necessity. In my view, *Shofstall* did not decide the scope of our constitution's education article. *Shofstall* was exclusively an equal protection case that decided two questions: first, whether the student plaintiffs were deprived of equal protection by the school financing plan, and second, whether the taxpayer plaintiffs were so deprived. 110 Ariz. at 89, 91, 515 P.2d at 591, 593. The briefs did not argue and the court evidently neither considered nor decided whether the financing system violated the general and uniform provisions of art. 11, § 1.

---

**2.** Contrary to the opinion, I do not believe that *Albright v. Oliver*, —— U.S. ——, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), applies. Maj. op. at 238, 877 P.2d at 811. We already visited the issue in *Shofstall* under the equal protection provisions of our state constitution; we need but to revisit that case and correct its analytical error in the application of the clause. Contrary to the concern of the dissent, this does not require overruling the legal principle announced in *Shof-*

*stall.* Diss. op. at 254, 877 P.2d at 827. It is not a question of new personnel on the court. It is, rather, the need to use the strict scrutiny test, as established by subsequent opinions, as the appropriate analytical basis for determining the validity of these statutes. *See Lowing v. Allstate Ins. Co.*, 176 Ariz. 101, 107, 859 P.2d 724, 730 (1993); *Wiley v. Industrial Comm'n*, 174 Ariz. 94, 103, 847 P.2d 595, 604 (1993).

Thus, *Shofstall*'s discussion of art. 11, § 1 went to the nature of the fundamental right possessed by the student plaintiffs. The statement that the "present school laws do provide for a system which was statewide and uniform" was not made in the context of an article 11 analysis of the financing plan but only in the context that the "constitution does establish education as a fundamental right." *Id.* at 90, 515 P.2d at 592.

Therefore, the meaning of the general and uniform clause of art. 11, § 1, as applied to financing schemes, is a question of first impression in Arizona. The legislature evidently saw this in the same light because, after *Shofstall* was decided, it immediately changed the financing scheme for operational expenses, adopting substantial equalization as the principle. 1974 Ariz.Sess.Laws, First Spec.Sess., ch. 3. It did not, however, apply this same system to school facilities, the question before us today.

Given this, I agree without hesitation with Justice Martone that the state must create and maintain a general and uniform school system. "Discretion is left to the legislature as to how it does so, but it must do so." Maj. op. at 240, 877 P.2d at 813. Thus I conclude, as he does, that the state cannot delegate to school districts the responsibility to create a general and uniform school system. Indeed, article 11 *requires* the state legislature to enact laws providing "for the establishment and maintenance of a general and uniform public school system." Given this, it is not possible to agree with the dissent's view that state financing of basic educational opportunity is mutually exclusive with local control. Diss. op. at 253, 877 P.2d at 826.

Thus, I share the view that independent of section 10, art. 11, § 1 prohibits the legislature from adopting a financing scheme such as the one presently in effect, which assures gross disparities in facilities, and requires instead that the legislature affirmatively enact a financing scheme that establishes a general and uniform system of education.

It is only at this point that I depart from the opinion. I do not share its concept of what the legislature is required to do and disagree with its answer to the rhetorical question: "But what then is a general and uniform public school system?" Maj. op. at 241, 877 P.2d at 814. In my view, the constitution does not require that the state "provide sufficient funds to educate children on substantially equal terms." *Id.* at 241, 877 P.2d at 814. Further, I believe that we have an obligation to explain to the legislature, which after all must now create a new financing scheme, just what the constitution requires and what we mean when we state that the system must provide an adequate education. *Id.* at 242, 877 P.2d at 815.

The framers of our constitution contemplated both local control of school districts and that schools would be financed, at least on a primary basis, through school district levies. As the dissent points out, this was the regime before the constitution was drafted, at the time it was adopted, and throughout statehood. Diss. op. at 253, 877 P.2d at 826. By sustaining this regime, the framers perpetuated what is inherent in it—some degree of inequality.

The general and uniform clause was enacted to limit this inequality. But limit it to what? Arizona history, common sense, and persuasive precedent from a sister state supply the answer. The clause was intended to guarantee not the unattainable result—equal education—but an equal *opportunity* for each child to obtain the *basic, minimum education* that the state would prescribe for public school students. One of our most capable state constitutional scholars has also concluded that the general and uniform language "suggest[s] statewide minimum standards." John D. Leshy, THE ARIZONA STATE CONSTITUTION: A REFERENCE GUIDE 247 (1993).

As Justice Martone acknowledges, an Arizona school district may provide capital facilities that "go above and beyond the statewide system." Maj. op. at 242, 877 P.2d at 815. But when the state itself sets minimum, basic standards for educational curricula and attainment—as it does in Arizona—the general and uniform clause requires that the state provide a financing scheme that will enable each district in the state to acquire the facili-

ties and equipment necessary to achieve those standards.

At this point, it would be very helpful to analyze cases from other states construing similar constitutional language. Unfortunately, as Justice Martone indicates, precedent has generally not been very informative or persuasive in ascertaining the meaning of the "general and uniform" language in our constitution's education article. Maj. op. at 241, 877 P.2d at 814. The important exception is Washington. It is not surprising that the Washington Supreme Court has crafted the most compelling decisions in this area. In educational matters, Arizona and Washington are remarkably alike, and not just by happenstance. As a condition to their admission to the Union, Congress required both states to provide for the establishment and maintenance of public school systems.[3]

Because it was admitted to statehood in 1889, Washington was the first of these two territories to respond to this congressional mandate. Washington's solution appears at Wash. Const. art. 9, § 2 (1889), which states that the "legislature shall provide for a general and uniform system of public schools." In 1910, the delegates to the Arizona Constitutional Convention clearly paraphrased this language in adopting Ariz. Const. art. 11, § 1, which provides: "The Legislature shall enact such laws as shall provide for the establishment and maintenance of a general and uniform public school system." Given

the fact that our delegates routinely borrowed provisions from the Washington Constitution,[4] our nearly identical general and uniform education clauses are far more than coincidence.

The Washington Supreme Court has also preceded Arizona in directly confronting the meaning of the general and uniform directive in its constitution. The two most instructive Washington Supreme Court opinions are *Seattle School District No. 1 v. Washington*, 90 Wash.2d 476, 585 P.2d 71 (1978), and *Northshore School District No. 417 v. Kinnear*, 84 Wash.2d 685, 530 P.2d 178 (1975). Both cases cogently analyze the school financing dilemma in the context of the constitutional clause that was the model for Ariz. Const. art. 11, § 1. For these reasons, and because of long-standing, clear Arizona precedent on constitutional construction, the two opinions are exceptionally persuasive. *See Solana. Land Co. v. Murphey*, 69 Ariz. 117, 124, 210 P.2d 593, 597 (1949) ("While the opinion from the Supreme Court of Washington is not controlling, it is peculiarly persuasive both by reason of its sound reasoning as well as the fact that our constitutional provision . . . was obviously copied from the constitution of that state.").[5]

In terms actually relating to student educational opportunities, *Northshore* defines the constitutionally-mandated general and uniform school system as one in which every schoolchild has "free access to certain *minimum and reasonably standardized edu-*

**3.** The Washington Enabling Act stipulates: "That provision shall be made [in the Washington Constitution] for the establishment and maintenance of [a] system[ ] of public schools, which shall be open to all the children of [Washington], and free from sectarian control." Act of Feb. 22, 1889, ch. 180, 25 Stat. 677, § 4, ¶ Fourth. The Arizona Enabling Act similarly states: "That provisions shall be made [in the Arizona Constitution] for the establishment and maintenance of a system of public schools which shall be open to all the children of [Arizona] and free from sectarian control." Act of June 20, 1910, ch. 310, 36 Stat. 570, § 20, ¶ Fourth.

**4.** *See, e.g., Mohave County v. Stephens*, 17 Ariz. 165, 170–71, 149 P. 670, 672 (1915) ("section 4, art. 6 of our Constitution is taken almost word for word from the Washington Constitution"); *Faires v. Frohmiller*, 49 Ariz. 366, 371, 67 P.2d 470, 472 (1937) (as "far as its judicial features

were concerned," the Arizona Constitution was "evidently modeled on similar provisions" in the Washington Constitution); *Desert Waters, Inc. v. Superior Court*, 91 Ariz. 163, 166, 370 P.2d 652, 654 (1962) (Arizona constitutional clause against uncompensated taking of private property "was adopted from the constitution of Washington"); *Mountain States Tel. & Tel. Co. v. Arizona Corp. Comm'n*, 160 Ariz. 350, 356 n. 12, 773 P.2d 455, 461 n. 12 (1989) (Arizona Constitution's Declaration of Rights "came essentially verbatim" from Washington Constitution).

**5.** This is a time-honored doctrine. *See Schultz v. City of Phoenix*, 18 Ariz. 35, 42, 156 P. 75, 77 (1916) (When clauses in the Washington Constitution are "very much like the same provisions" in our constitution, "we think the law announced by [the Washington Supreme Court] is very persuasive."); *see also Cienega Cattle Co. v. Atkins*, 59 Ariz. 287, 292, 126 P.2d 481, 483 (1942).

cational and instructional *facilities* and opportunities to at least the 12th grade." 530 P.2d at 202 (emphasis added). In 1978, the Washington Supreme Court required the legislature to "act to comply with its constitutional duty by defining and giving substantive meaning to" the required basic education or course of study. *Seattle Sch. Dist.*, 585 P.2d at 95.[6] The court found the school funding system unconstitutional because it did not assure enough money for Washington students to attain a basic education. *Id.* at 102–04;[7] *see also Bismarck Pub. Sch. Dist. # 1 v. State by and through North Dakota Legislative Assembly*, 511 N.W.2d 247, 262 (N.D.1994).

Moreover, the Arizona Constitution already tells us how to achieve a general and uniform school system. At the constitution's command and the legislature's direction, the Arizona State Board of Education ("Board") has already completed this difficult task. Article 11, § 2 provides that the "general conduct and supervision of the public school system shall be vested in a State Board of Education, a State Superintendent of Public Instruction, [and] county school superintendents...." Section 3 gives the legislature the right to prescribe the Board's "powers [and] duties." In 1912, our first state legislature enacted a law directing the Board to devise courses of study for Arizona's schoolchildren. *See* An Act To Provide for the Establishment and Maintenance of a *General and Uniform* Public School System, 1912 Ariz.Sess.Laws ch. 77, § 4, ¶ Sixth (emphasis added). As the title of the 1912 law indicates, it implements the constitutional language of art. 11, § 1. The Board has been performing this crucial and complex function ever since.

The present versions of this legislative directive are essentially unchanged. Under A.R.S. § 15–203(A)(15) (Supp.1993), the Board must:

> Prescribe a *minimum course of study* in the common schools, *minimum competency requirements* for the promotion of pupils from the third grade and *minimum course of study and competency requirements* for the promotion of pupils from the eighth grade.

(Emphasis added); *see also* A.R.S. § 15–721 (course of study and textbooks for the common schools).

A.R.S. § 15–203(A)(16) (Supp.1993) requires the Board to:

> Prescribe [a] *minimum course of study and competency requirements* for the graduation of pupils from high school.

(Emphasis added); *see also* A.R.S. § 15–722 (course of study and textbooks for the high schools).

The Board regularly sets and updates the minimum courses of study and competency requirements for Arizona's schoolchildren.[8] The courses of study are basic; the competency requirements are attainable by the average, reasonably motivated student. In light of this, I can only conclude that the legislature cannot constitutionally impose a capital funding scheme that creates such disparity in facilities and equipment that it prevents some Arizona school districts from fur-

---

6. As noted *post* at n. 8, the Arizona Legislature long ago directed the Arizona State Board of Education to set minimum courses of study and competency requirements for Arizona's schoolchildren.

7. Interestingly, as this case worked through the appellate system, the Washington Legislature was already crafting a plan to overhaul and equalize state public school funding. The new law took effect in late 1978. *See* The Washington Basic Education Act of 1977, 1977 Wash.Laws, Ex.Sess., ch. 359 (eff. Sept. 1, 1978).

8. Simplifying somewhat, to graduate from an Arizona high school, a student must complete twenty credits (a credit is a year-long course): (1) four credits of English; (2) one and one-half credits on the United States and Arizona constitutions and Arizona history; (3) one credit of world history/geography; (4) one-half credit on the free enterprise system; (5) two credits of mathematics; (6) two credits of science; (7) one credit of fine arts or vocational education; and (8) eight additional credits the local governing board prescribes, subject to approval by the Board. Ariz.Admin.Code R7–2–302.03 (1989). Thus, under the authority of Ariz. Const. art. 11, §§ 2 and 3 and the legislature's directive, our system presently effectuates the uniformity provisions of art. 11, § 1 by prescribing a minimum statewide curriculum (items 1–7) for twelve credits, plus eight additional credits at the discretion of and of a nature chosen on the local level (subject to Board approval).

nishing the environment, facilities, textbooks, equipment, and other capital resources needed to give students an equal opportunity to attain the Board's prescribed minimum course of study.

Contrary to the opinion, however, I do not go so far as to conclude that even if every child in the state were receiving an "adequate education, gross facility disparities" resulting from a state-imposed financing scheme "would violate the uniformity clause." Maj. op. at 241 n. 7, 877 P.2d at 814 n. 7. I go no further than this: the Board, acting under legislative authority and direction, has set minimum educational standards applicable to all Arizona school districts. To the extent that the legislature fails to put into effect a financing scheme that provides for facilities and equipment that will enable all districts to give their students the opportunity to meet the minimum standards that the state itself has set, the legislature has failed to comply with the constitutional requirement that it "*shall* enact such laws as shall provide for the establishment and maintenance of a general and uniform public school system." Ariz. Const. art. 11, § 1 (emphasis added).

Finally, I disclaim any notion that quality of education depends on the amount of money spent. I agree, to be sure, that "there is some correlation between the amount of money spent and the quality of education." Diss. op. at 253, 877 P.2d at 826. I think it enough to say, however, that this case turns on the facts, pleaded and argued by the plaintiffs and not denied by the state, that show a correlation exists. Moreover, logic and experience also tell us that children have a better opportunity to learn biology or chemistry, and are more likely to do so, if provided with laboratory equipment for experiments and demonstrations; that children have a better opportunity to learn English literature if given access to books; that children have a better opportunity to learn computer science if they can use computers, and

so on through the entire state-prescribed curriculum.

If these concepts are wrong, then the state should have interposed some sort of denial, or we should perhaps vacate judgment and remand for further evidence. It seems apparent to me, however, that these are inarguable principles. If they are not, then we are wasting an abundance of our taxpayers' money in school districts that maintain libraries and buy textbooks, laboratory equipment, and computers.

## C. METHODOLOGY

Both the opinion and the dissent take the view that the concept of minimum state standards is a "theory" neither "pled nor proved" and "beyond the scope of the pleadings in this case," thus "afford[ing] us no opportunity to define ... minimum standards under the constitution." Diss. op. at 251 n. 1, 877 P.2d at 824 n. 1, maj. op. at 241 n. 7, 877 P.2d 814 n. 7. I believe these conclusions are incorrect. The pleadings and the summary judgment motion raised these issues.

In their complaint, plaintiffs alleged that the "school districts are unable to provide students in their districts with facilities essential to adequate provision of curriculum." [9] In their motion for summary judgment, plaintiffs argued and presented evidence that deficiencies in capital facilities "materially and substantially detract from the quality of education received by students in the plaintiff districts, and result in many students receiving an inadequate and substandard education." [10] When replying in support of their motion for summary judgment, plaintiffs also asserted that the "uncontroverted evidence in this case shows that educational opportunities for children in poor school districts are systematically reduced because of inadequate capital funding." [11]

In their opening brief to this court, plaintiffs cited the Arizona Superintendent of Public Instruction's trial testimony (by affidavit) that "modern well-equipped school fa-

---

9. Complaint at ¶ 48 (May 21, 1991).

10. Statement of Facts in support of Plaintiffs' Motion for Summary Judgment at ¶ 6 (April 14, 1992).

11. Reply to Defendants' Response to Plaintiffs' Motion for Summary Judgment at 12 (July 10, 1992).

cilities are very important in ensuring a quality education for school children." [12] Of course, the state vigorously argued throughout this case that school facilities do not affect the adequacy of a child's education. Plaintiffs countered, saying that "the state's claim that school facilities are irrelevant to learning is contrary to modern opinion and common sense." [13] The record, in short, is replete with examples in which the issue of the districts' inability to comply with the prescribed curriculum and standards was raised as a part of the argument on the meaning and interpretation of the general and uniform provision.

Thus, I believe the issue is squarely before us. If there is any doubt as to the facts, appropriate deference to the reasoned views of the other members of the court does not require acquiescence in the trial court's grant of summary judgment. We cannot close our eyes to the educational standards existing in the real world or refuse to read the statutes enacted by our first state legislators in attempting to effectuate the constitutional requirements that they enact a general and uniform system of schools. Deference to the needs of our citizens demands, instead, that summary judgment be vacated and the case remanded for a full trial on the issues.

This case is simply too important to be decided by parsing sentences in a two-foot stack of pleadings, motions, and briefs. It involves the meaning and application of a state constitutional clause that gives the children of Arizona a fundamental constitutional right to education and that places on the legislature the corresponding obligation to enact laws necessary to establish and maintain a system that will transform that right from dry words on paper to a reality bringing to fruition the progressive views of those who founded this state.

Parents, their children, and all citizens need to know what rights the constitution gives our children, and the legislature needs to know the extent of its obligation in effectuating those rights. This court exists primarily for the purpose of resolving such issues.

Neither the intricacies of code pleading, the nuances of WIGMORE ON EVIDENCE, nor the lawyers' artfulness in drafting pleadings should control the outcome of such a case. When this court decided *Shofstall* in 1973, it left open the meaning of the general and uniform clause. The issues are now squarely before us, and now is the time to decide them. If the factual record is too deficient to support judgment, we need to remand for a full trial. If the legal issues were not well argued, we should request additional briefing. But let us get on with it.

I believe, however, that the record in this case is quite sufficient to enable us to read the constitution in light of the decisions of our sister state, from whom we borrowed this clause, and the statutes passed by our legislature to effectuate that language. Thus, I join the plurality in holding that the present statutory scheme provides for neither a general nor a uniform funding system and that the legislature must follow the constitutional command that it enact such a method for establishing and maintaining our public school system.

### CONCLUSION

I concur in the result and much of the analysis of the opinion and join in the holding that the present state financing system for capital facilities violates Ariz. Const. art. 11, § 1. The very structure of the present financing scheme denies to Arizona's schoolchildren the general and uniform school system that is their right under our constitution. Although local control is to be preserved and equality in facilities and equipment is not required, the system cannot claim uniformity if the legislature's financing scheme results in such great disparity in facilities and equipment that many children are denied the opportunity to obtain the basic education that the state itself requires.

MOELLER, Vice Chief Justice, dissenting.

We should "not declare an act of the legislature unconstitutional unless we are satis-

---

12. Appellants' Opening Brief at 10 (June 1, 1993) (citation omitted to expert affidavit evidence before the trial court).

13. Appellants' Reply Brief in Arizona Court of Appeals at 13 (May 25, 1993).

fied beyond a reasonable doubt that the act is in conflict with the federal or state constitutions." *Chevron Chem. Co. v. Superior Court,* 131 Ariz. 431, 438, 641 P.2d 1275, 1282 (1982). The "burden of establishing that a statute is unconstitutional rests on the party challenging its validity." *Hall v. A.N.R. Freight System, Inc.,* 149 Ariz. 130, 133, 717 P.2d 434, 437 (1986). In my view, plaintiffs have not shown Arizona's public school financing scheme to be unconstitutional under either of the two theories they advance. Therefore, I respectfully dissent.

## I. Overview

Justice Martone's plurality opinion is based on article 11, section 1, which specifies that the legislature "shall enact such laws as shall provide for the establishment and maintenance of a general and uniform public school system." Although the opinion does not define what constitutes a "general and uniform" public school system, it holds that the present system is unconstitutional because there are substantial capital facility disparities between and among public school districts. Maj. op. at 242–243, 877 P.2d at 815–16. Such a system, the opinion asserts, is not "general and uniform." *Id.* at 243, 877 P.2d at 816.

Chief Justice Feldman, in his special concurrence, agrees with the plurality that the present system is unconstitutional because it is not "general and uniform." However, he disagrees with the plurality that "general and uniform" requires facilities within the public school system to be substantially uniform. Concurrence at 248–249, 877 P.2d at 821–22. Instead, he finds the present system uncon-

stitutional because it allegedly fails to provide all children with the facilities necessary to achieve an adequate (i.e., a "basic, minimum") education. Concurrence at 246, 877 P.2d at 819. The Chief Justice would also find the capital funding system unconstitutional on state equal protection grounds. Concurrence at 245, 877 P.2d at 818.

I agree with Chief Justice Feldman that the "general and uniform" clause does not require all districts to have substantially comparable facilities and equipment as impliedly and necessarily required by the plurality. However, I also agree with the plurality that the third constitutional theory advanced by the Chief Justice goes beyond the scope of the pleadings in this case. *See* Maj. op. at 241 n. 7, 877 P.2d at 814 n. 7. The plaintiffs neither pled nor proved that the present school system fails to provide children an "adequate" education. Indeed, they expressly disclaimed reliance on any such theory.[1] Because I believe the Chief Justice addresses an issue not properly before the court, I confine my comments in section II on the uniformity issue mostly to the plurality's analysis. I address Chief Justice Feldman's equal protection analysis in section III.

## II. The "General and Uniform" Clause

I cannot subscribe to the plurality's analysis of the "general and uniform" clause for several reasons. First, the plurality holds the present financing scheme unconstitutional because it is asserted that the scheme itself is the cause of substantial capital facility disparities between and among the various school districts. This holding is troublesome

---

1. *See, e.g.,* Appellant's Opening Brief at 27 ("the equal protection clause is not addressed to minimal sufficiency but rather to ... unjustifiable inequality."); at 30–31 ("a public school system that is 'general and uniform' is one in which any randomly selected slice of the system closely resembles any other slice."); *see also* Appellant's Reply Brief at 6, 11, and 14.

I disagree with Chief Justice Feldman's conclusion that the plaintiffs raised and argued the theory he now espouses, i.e., that the school financing system is unconstitutional because it fails to provide the facilities necessary for students to achieve a "basic, minimum" education. Quite simply, the plaintiffs argued throughout that the system is unconstitutional because—and

solely because—it produces massive disparities in capital facilities between and among school districts. Indeed, in their reply brief, the plaintiffs reject the Chief Justice's theory: "In contrast to the concrete factors associated with educational opportunity [i.e., size and condition of facilities, availability of equipment, etc], educational success or achievement does not present a manageable standard for the courts." Appellant's Reply Brief at 14.

The record does not show that students in some districts are being denied an "adequate education," however that term is defined. This is telling. Plaintiffs obviously decided not to present their case on that ground.

and I am concerned about what it means when taken to its logical conclusion. It is true now—as it has been historically—that individual school districts are expected to provide much of the funding for capital facilities, and that much of this funding must be raised through bonded indebtedness by the individual districts. It is also true, as the plurality points out, that a district's ability to approve and issue bonds under today's financing scheme is significantly affected by the property value and taxpayer willingness of the particular district. Maj. op. at 237, 877 P.2d at 810. In finding the current financing scheme to be the cause of today's disparities among districts, however, the plurality focuses only on the first of these two factors—property value. It does not consider the fact that disparities may as well be attributed to individual districts choosing not to indebt themselves sufficiently to provide the facilities the plurality now deems constitutionally necessary. The record in this case merely shows that some districts, for whatever reason, have not raised the funds, not that any districts have in fact been prevented from raising the funds.

Absent a clear showing by plaintiffs that the present school financing scheme is itself the cause of today's capital facility disparities, the plurality's declaration of unconstitutionality loses the very premise upon which it is said to be based. That the present scheme may make it politically or economically difficult for some districts to raise as much money as others is certainly something our legislature has considered in the past—and may appropriately consider in the future—but those political or economic considerations do not render the financing scheme unconstitutional.

I also believe the plurality's reasoning is inherently inconsistent. The plurality requires the state to now devise a new funding scheme that will provide children of all districts with substantially comparable educational facilities, yet it permits—indeed it purports to encourage—individual school districts to provide additional facilities above and beyond those to be provided by the new state system. Maj. op. at 242, 877 P.2d at 815. The plurality explains that disparities do not run afoul of the "general and uniform" clause as long as they are not the "results" of the state's chosen financing scheme. *Id.* This analysis begs the question: would not any disparity be the result of the state's chosen financing scheme? If the state scheme, no matter how benign, "permits" facility disparities, the disparities are the "result" of the financing scheme. I fail to grasp the plurality's distinction between disparities caused by the state's financing scheme, which the plurality says are not permitted, and disparities caused by school districts, which the plurality says are permitted. The two are interrelated; in both instances the disparities come about by reason of the differences in school districts. Whether the present state scheme "causes" disparities or some future scheme "permits" disparities, the disparities are the "result" of the scheme.

Notwithstanding the plurality's disclaimer, I believe that its holding will inevitably mean that any funding system is unconstitutional as long as we have school districts and property taxes, unless each school district is substantially comparable in fund raising ability and unless the state constantly redefines districts to maintain their fund-raising capacity status quo. The educational provisions of our constitution, enacted with full knowledge that Arizona had both school districts and property taxes, do not command such a result.

Nor do I agree that the "general and uniform" clause means that the state financing scheme must ensure that all schools have substantially comparable facilities and equipment, as impliedly and necessarily required by the plurality. This court has previously observed, albeit in dicta, that Arizona's legislative scheme does indeed provide a "general and uniform" system. *Shofstall v. Hollins,* 110 Ariz. 88, 90, 515 P.2d 590, 592. More importantly, since territorial pre-constitution days, Arizona has left it up to individual school districts to raise funds for capital facilities. Those individual districts have always responded differently, exercising what has forever been perceived as a cherished right of local control. Unless and until it is shown that the present capital financing scheme deprives our state's children of a basic edu-

cation, no question of unconstitutionality is presented. As we have previously noted, plaintiffs have not alleged, nor have they tried to prove, that the present system has deprived anyone of a basic education. *See supra* n. 1. There is no violation of the "general and uniform" clause.

I am concerned that, carried to its logical conclusion, the plurality's analysis requires the state to ensure equality of financing for our public schools. Simply equalizing the capital funding between and among school districts, however, will not provide equal educational opportunities, nor will it solve the pervasive problems inherent in our present public school system. Countless studies bear this out. *See, e.g.,* Richard J. Stark, *Education Reform: Judicial Interpretation of State Constitutions' Education Finance Provisions—Adequacy vs. Equality,* 1991 Ann. Surv.Am.L. 609 (1992). To be sure, there is some correlation between the amount of money spent and the quality of education; but there are myriad other factors at work as well. Equitable arguments for greater equalization are indeed appealing, but they should appropriately be addressed to our legislature where they have met with some degree of success in the past.

Lastly, on the uniformity point, I fear that today's plurality opinion will eviscerate effective local control of our public schools. I find it ironic, therefore, that both the plurality opinion and the special concurrence pay homage to the historical significance of local control. Maj. op. at 242, 877 P.2d at 815 and concurrence at 244–245, 877 P.2d at 817–818. If the state is constitutionally mandated to ensure equalized funding to our public schools to assure the uniformity of their facilities, the state necessarily must effectively control the expenditure of those funds. The state cannot leave it up to local districts to decide how to spend the funds it doles out because the districts might respond in diverse ways (as they have in the past), creating, once again—at least in the view of the plurality and the special concurrence—an unconstitutional non-uniform system. Under the plurality's approach, local control in the past has contributed to today's declaration of unconstitutionality—some districts have been willing to tax themselves to incur bonded

indebtedness and some have not. If local control has led, at least in part, to the inequalities that now make today's system unconstitutional, I fail to see how the plurality can accept and encourage its continued meaningful role under a future, supposedly constitutional scheme.

I simply disagree with the plurality and the special concurrence which urge that centralized state financing may peacefully coexist with meaningful local control. Local control and centralized funding are mutually exclusive, a truism shown time after time in present governmental affairs. All experience indicates that control follows the dollars. The plurality properly concedes the importance of local control in our schools and correctly acknowledges that the state system will suffer if such control is lost. Yet, enforcement of the plurality opinion will inevitably diminish local control. The framers of the Arizona constitution never intended such an anomalous result.

### III. Equal Protection

Chief Justice Feldman, in his special concurrence, argues that the financing scheme should also be declared unconstitutional on state equal protection grounds. I disagree, for two reasons.

First, I agree with Justice Martone that a court should not reach a general constitutional provision if a specific constitutional provision is dispositive. Maj. op. at 238, 877 P.2d at 811. Although I disagree with their analyses, a majority of the court has concluded that the specific "general and uniform" education clause of our constitution is dispositive. Thus, there is no need to reach the state equal protection issue. Indeed, there are persuasive jurisprudential grounds for not doing so.

But if we were to reach the issue, plaintiffs have not shown that the present school financing scheme violates the state equal protection clause. This precise issue was settled by this court in 1973. In *Shofstall,* this court, in a unanimous opinion, held that our school financing scheme did not violate the equal protection clause of our state constitution. 110 Ariz. at 90, 515 P.2d at 592. We still have the same constitution. We still

have school districts and property taxes. Indeed, we have a much more "general and uniform" public school system today considering the various equalization statutes passed by the legislature since 1973. With the exception of greater equalization, the only thing that has changed since the *Shofstall* decision in 1973 is the personnel of this court. That is an insufficient reason to change a constitutional ruling. *State v. Salazar,* 173 Ariz. 399, 416–17, 844 P.2d 566, 583–84 (1992) (citing *State v. Crowder,* 155 Ariz. 477, 483, 747 P.2d 1176, 1182 (1987) (Moeller, J., concurring in part and dissenting in part)). Both of the other opinions in this case make much of certain selected language of *Shofstall,* yet they ignore its express holding. The plaintiffs have not shown how today's system violates the equal protection clause of our constitution.

## IV. Conclusion

I dissent not because the school system in Arizona is perfect. I dissent because it is not unconstitutional. Questions concerning the fine tuning of the financing schemes should appropriately be addressed to the legislature. The system is a complex one and, while a majority of the court believes it is unconstitutional, it is short on specifics. From reading the plurality opinion, I cannot tell which specific statutes are considered unconstitutional and which may survive. No guidance or timetable is provided to the legislative and executive branches as to how and by when this perceived unconstitutionality should be corrected. If I were in the executive or legislative branch of government and charged with the responsibility of fixing the allegedly broken system, I would have no idea where to begin. I hope the legislative and executive branches are more prescient than I. As for me, I heed the cautionary language of the United States Supreme Court:

> The consideration and initiation of fundamental reforms with respect to state taxation and education are matters reserved for the legislative processes of the various States, and we do no violence to the values of federalism and separation of powers by staying our hand. We hardly need add that this Court's action today is not to be viewed as placing its judicial imprimatur on the status quo. The need is apparent for reform in tax systems which may well have relied too long and too heavily on the local property tax. And certainly innovative thinking as to public education, its methods, and its funding is necessary to assure both a higher level of quality and greater uniformity of opportunity. These matters merit the continued attention of the scholars who already have contributed much by their challenges. But the ultimate solutions must come from the lawmakers and from the democratic pressures of those who elect them.

*San Antonio School District,* 411 U.S. 1, 58–59, 93 S.Ct. 1278, 1309–10 (1973). Like the United States Supreme Court, I believe the legislature is better suited to address and solve the substantial and pervasive problems in today's public school system. I respectfully dissent.

CORCORAN, J., concurs in Vice Chief Justice MOELLER's dissent.