Jeremy MAGYAR, by and through his father, Steven Magyar, Plaintiff,

v.

TUCSON UNIFIED SCHOOL DISTRICT, Defendant.

Civ. No. 96–448 TUC RMB.

United States District Court, D. Arizona.

March 14, 1997.

## ORDER

BILBY, Senior District Judge.

### I. Introduction

This dispute arises from the successful efforts of Tucson Unified School District ("TUSD" or the "District") to expel Plaintiff Jeremy Magyar for bringing a knife to school. At the time of his expulsion, Jeremy qualified for special education services under the Individual with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.* (Supp.1996). After unsuccessfully appealing the District's expulsion decision, Steven Magyar on behalf of Jeremy, brings this suit against TUSD challenging the hearing officer's conclusion, its reliance on *Doe v. Maher, infra,* and the District's expulsion policy as it relates to handicapped students. The Magyars seek: (1) a declaration of rights; (2) to enjoin the defendant from excluding him the educational services; and (3) to compel the defendant to provide him with compensatory education. TUSD objects to any relief asserting that its expulsion policy comports with the IDEA.

Before the Court today are the parties' cross-motions for summary judgment. The Court granted the United States leave to file a brief as *amicus curiae* on behalf of the United States Department of Education. Upon review of the administrative record,

the pleadings submitted and relevant law, the Court concludes that TUSD must provide educational services to handicapped students who are expelled for reasons found to be unrelated to their handicapping condition. Additionally, TUSD violated the IDEA when it suspended Jeremy for 175 days without providing educational services as required by Jeremy's Individualized Education Plan ("IEP"). Finally, as a direct result of TUSD's conduct, Jeremy is presently being denied a free and appropriate education as mandated by the IDEA.

## II. Standard of Review

Judicial review under the IDEA provides that "the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). This is contrary to the usual judicial review which is limited to the record below and requires the court to accord agency actions with great deference. *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1471 (9th Cir.1993), *cert. denied*, 513 U.S. 825, 115 S.Ct. 90, 130 L.Ed.2d 41 (1994).

Section 1415(e)(2) does not, however, invite the reviewing court to "substitute [its] own notions of sound educational policy for those of the school authorities." *Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982). Thus, the court should give deference to the administrative findings of the hearing officer when they are thorough and careful. *Union School Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir.), *cert. denied*, 513 U.S. 695, 115 S.Ct. 428, 130 L.Ed.2d 341 (1994). The reviewing court should also "accord deference to the policy decisions of a school district when it is acting within the bounds of federal and state law." *Id.*

The Ninth Circuit in *Union School Dist. v. Smith*, stated that a federal court sitting in review of a school district's hearing officer's decision under the IDEA is a two-step process:

First, the court must determine whether the rigorous procedural requirements of IDEA have been met.

Second, the court must determine whether the state has met the substantive component of the IDEA—the requirement that the state provide an 'appropriate' education.

*Id.* (citing *Rowley*, 458 U.S. at 206–07, 102 S.Ct. at 3050–51).

## III. Undisputed Facts and Procedural Background

The relevant facts are not in dispute. Jeremy is a fifteen-year-old child who qualifies for special education services under the IDEA. His father, and legal guardian, Steven Magyar, lives within the attendance boundaries of TUSD. Jeremy attended Secrist Middle School from January 1995 through September 21, 1995. His last agreed-upon IEP was drafted on February 13, 1996. That Plan is effective for one calendar year and indicates that Jeremy is to receive 825 minutes of specialized instruction per week. His program is described as "Emotional Disabled/Cross Categorical."

On September 21, 1995, at the age of fourteen, Jeremy gave an assault-style knife to another student who then put the knife in his own pocket. When questioned by the assistant principal, the student produced the knife and said it belonged to Jeremy. Jeremy readily admitted ownership, but when asked why he brought it to school, Jeremy repeatedly said, "I don't know." The knife was not brandished or used in any threatening way.

Bringing a knife to school violated TUSD's *Guidelines for Student Rights and Responsibilities*, Code #31—"Possession and/or Concealment of Weapon." Consequently, Jeremy received an immediate short-term suspension, effective September 21, 1995 to October 4, 1995. He was also arrested by the Tucson Police Department for possession of a weapon on a school campus.

On September 22, 1995, pursuant to District policy, a "knowledgeable group" of District personnel met to determine if Jeremy's misconduct was related to his handicapping condition. This group consisted of the assis-

tant principal, special education teacher, regular education teacher, and school psychologist. Neither Jeremy, nor his father were given an opportunity to participate at this meeting. By notice of September 25, 1995, the District informed Steven Magyar of its decision that Jeremy's conduct was unrelated to his disability. The notice also informed Mr. Magyar that if he disagreed with the determination, he could request a due process hearing. No such hearing was requested.

On September 29, 1995, a discipline hearing was conducted. By letter dated October 11, 1995, the hearing officer announced her decision to extend Jeremy's suspension for a total of 175 days and to recommend that Jeremy be expelled.

The District did not convene an IEP meeting, nor did it provide any educational services to Jeremy during the entire period of his long-term suspension. From October 2, 1995 until November 29, 1995, Jeremy worked in the Graffiti Abatement Project under the supervision of a Pima County Juvenile Court surveillance officer. There is no educational component associated with that project.

On November 11, 1995, the Governing Board met in executive session to consider the recommendation to expel Jeremy. The Governing Board referred the matter to a hearing officer for report and recommendation. Mr. Magyar was notified that an expulsion hearing was to be held on December 12, 1995.

After that hearing at which Jeremy's Court Appointed Special Advocate and Jeremy attended, the hearing officer recommended that Jeremy be expelled until the second semester of the 1996–97 school year. The hearing officer also recommended the following conditions be fulfilled prior to Jeremy's readmission:

1. That he has complied with all terms of his probation related to his arrest for this incident . . . ;

2. That he has completed an alternative education program outside of TUSD during each of the Spring 1996 and Fall 1996 semesters, or alternatively, that he has, alternatively, completed 20 hours of employment or community services during each week of those school semesters.

Index to Administrative Record Item No. 4, Exhibit J (hereinafter "Index"). The hearing officer recommended that the District evaluate Jeremy's special education program in January 1997. In the notice to Mr. Magyar, the expulsion hearing officer provided the father with a list of alternative education programs as a convenience. This Report and Recommendation indicates that there may be a cost involved in the suggested programs. The document does not indicate that the District would assume the costs of these alternatives. The District also did not take any action to enroll Jeremy in an alternative program. On January 23, 1996, the Governing Board adopted the expulsion hearing officer's Report and Recommendation and voted to expel Jeremy.

The District did not convene an IEP meeting since it is the District's written policy that educational services may be discontinued for children with disabilities who are long-term suspended or expelled from school for conduct unrelated to the disability. TUSD's long-term suspension/expulsion policy states in relevant part:

If the knowledgeable group determines that the behavior is NOT a result of a student's handicapping condition, educational services *may be* interrupted. This means that the student can be treated exactly as though s/he were a non-special education child.

Index, Exhibit P, "Discipline, Suspension, Expulsion For Special Education Students" at 2 (emphasis in original).

On January 31, 1996, Steven Magyar made a written request for a special education due process hearing. The District convened an IEP meeting on February 13, 1996, for the stated purpose of "insur[ing] that when Jeremy returns to school his IEP would still be in compliance and he could still receive services without interruption." The proposed IEP includes an initiation date of February 13, 1996. The IEP states, however, that the IEP goals and objectives will not be "attempted this 1995–96 school year due to a

long term suspension of Jeremy." Index at Item 4, Exhibit M. The proposed IEP offers no alternative educational program for Jeremy during his expulsion.

Jeremy attended Home Quest, a private non-profit alternative day school operating under the auspices of Vision Quest, from approximately late January to early May 1996. His placement was arranged through and the costs underwritten by the Pima County Juvenile Court system and Mr. Magyar.

The Pima County Juvenile Court system referred Jeremy for enrollment in Vision Quest, a twenty-four hour residential program located in Elfrida, Arizona. For the first two months of his enrollment at Vision Quest, Jeremy was considered a non-special education student because a TUSD representative certified to the Arizona Department of Education that Jeremy was not "a student receiving special education" for purposes of his Vision Quest placement. Plaintiff Jeremy Magyar's Index to Post–Hearing Submission, Exhibit G (hereinafter "Post–Hearing Index"). Several months later, TUSD filed a corrected form accurately noting that Jeremy qualifies for special education services. *Id.*, Exhibit I. TUSD recognizes that while "Jeremy continues to be eligible for special education services as a student with emotional disabilities. He has been placed in a [residential treatment center] by a state placing agency for his care, safety and treatment and not for educational reasons." *Id.*, Exhibit C.

Jeremy is currently receiving general education as part of Vision Quest's comprehensive rehabilitation program. *Id.*, Exhibits A, B. There is no current IEP, nor has Mr. Magyar been asked to participate in a multidisciplinary conference as required by the IDEA.

### IV. Discussion

Jeremy is an emotionally disabled fifteen year old who is presently not receiving any educational services for his handicap.[1] This lawsuit involves two complex issues: (1) the precedential effect of certain passages in *Doe v. Maher*, 793 F.2d 1470 (9th Cir.1986) and (2) the educational rights of handicapped children under the Individuals with Disabilities Education Act (IDEA) who are long-term suspended or expelled for conduct determined to be unrelated to the handicapping condition. TUSD's policy permits it to cease providing educational services to this unique group of students.

Plaintiffs assert that TUSD's policy conflicts with the IDEA, congressional intent, federal case law, and longstanding Department of Education interpretations of the IDEA. The Department of Education is charged with the administration of the IDEA and has published numerous statements of policy guidance to assist states in complying with the Act. One of its consistent policies is that disabled children must receive educational services regardless of whether the misconduct is related to the handicapping condition.

Defendant contends that if TUSD cannot expel students for serious misbehavior, a "super class" of student will be created who will be given rights not afforded to regular education students. Defendant relies on *Doe v. Maher*, 793 F.2d 1470 (9th Cir.1986) which concerned the expulsion of special education students whose handicaps were found to be related to the misconduct.

### A. Case or Controversy?

As a threshold issue, the Court must address the suggestion raised by TUSD in its post-hearing submission, that this case fails to present a justiciable case or controversy. Under Article III of the Constitution, a federal court may adjudicate actual ongoing controversies. *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 546, 96 S.Ct. 2791, 2796, 49 L.Ed.2d 683 (1976). To do otherwise, would result in an impermissible advisory opinion. *U.S. Nat. Bank of Oregon v. Independent Ins. Agents of America, Inc.*, 508 U.S. 439, 445–47, 113 S.Ct. 2173, 2178, 124 L.Ed.2d 402 (1993).

---

1. The Court notes that the term "emotionally disabled" does not include children who are socially maladjusted, unless it is determined that they are seriously emotionally disturbed. 34 C.F.R. § 300.7(b)(9)(i)(E)(ii).

Here, TUSD asserts that since Jeremy "resides" in Elfrida, Arizona, there is no live controversy. A.R.S. § 15–824(B) defines a pupil's residence as the "residence of the person having legal custody of the pupil." Legal custody is further defined as "custody exercised by the natural or adoptive parents with whom a pupil resides." A.R.S. § 15–824(F)(2). Jeremy is currently under a juvenile court order to reside at Vision Quest, a residential treatment facility located in another county. *See* Post–Hearing Index, Exhibit D. TUSD argues that because Jeremy is not legally permitted to reside with his parent, Steven Magyar does not have "legal custody" of Jeremy for purposes of the school residency statutes. TUSD asserts then, that since Jeremy is not a "resident" of the District, TUSD is not responsible for Jeremy's education.

Plaintiffs disagree with this contention. Plaintiffs assert that there are two tests for residency. Section 15–824(B) as cited by TUSD, and "home district," for cases in which an individual does not possess actual custody. In those situations, the "home district" is the school district that the child last attended. A.R.S. § 15–761(9).

 The juvenile court order states in relevant part that Jeremy:

> be placed on official probation for a period of one year … under the care, custody and control of Steven Magyar, subject to the supervision of the Probation Department, under the following terms and conditions of Juvenile Intensive Probation Supervision:
>
> I. CONDITIONS OF PROBATION:
>
> Reside at Vision Quest residential Treatment cooperate and participate in all aspects of the program.

Post–Hearing Index, Exhibit D. Based on the juvenile court order, legal custody remains with Steven Magyar, Jeremy's father. The fact that Jeremy temporarily lives at Vision Quest, does not disturb that relationship, nor affect his school residency. *See Chapp v. High School Dist. No. 1,* 118 Ariz. 25, 27, 574 P.2d 493, 495 (Ct.App.1978) (minor's residence is that of the parent who has legal custody). Also, since the last public school Jeremy attended was Secrist Middle School, TUSD under the "home district" test is considered the home district for purposes of residency. Therefore, under either A.R.S. § 15–824(B) or 15–761(9), TUSD remains responsible for Jeremy's educational services.

**B. *Reach of Doe v. Maher***

The issue before the Court is whether TUSD can rightfully expel a special education student for conduct found to be unrelated to the handicapping condition. TUSD asserts that this question has been answered by the Ninth Circuit Court of Appeals in *Doe v. Maher,* 793 F.2d 1470 (9th Cir.1986), *affirmed as modified, sub nom., Honig v. Doe,* 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988). Plaintiffs and the Department of Education (hereinafter "Plaintiffs") contend that this Court is not bound by *Maher* because the relevant passages are *dicta* and should not be given controlling weight.

 Dicta are expressions in court's opinion which go beyond the facts before court and there are individual views of author of opinion and not binding in subsequent cases. Blacks Law Dictionary at 408 (1979). The basic formula for distinguishing holding from *dicta* is to take account of facts treated by the judge as material and determine whether the contested opinion is based on them. *United States v. Crawley,* 837 F.2d 291, 292 (7th Cir.1988). A court considering the impact of *dicta* must conduct its own analysis of the statutory language and other federal case law to determine whether, on balance, the *dicta* creates a conflict. *See United States v. Ricks,* 5 F.3d 48, 50 (3d Cir.1993) (district court cannot rely on dictum but must conduct its own analysis). Distinguishing holding from *dicta* is crucial since *dicta* is not authoritative and may be rejected by a later court, even if it is an inferior court. *Id.*

In *Maher,* two disabled, special education students were excluded from services by the San Francisco Unified School District, even though their misconduct was related to their respective disabilities. On appeal, the Ninth Circuit stated:

> If a child's misbehavior is properly determined not to be a manifestation of his handicap, the handicapped child can be

expelled. [citations omitted] When a child's misbehavior does not result from his handicapping condition, there is simply no justification for exempting him from the rules, including those regarding expulsion, applicable to other children. Therefore, when a handicapped child is properly expelled, the school district may cease providing all educational services, just as it could in any other case. To do otherwise would amount to asserting that all acts of a handicapped, both good and bad are fairly attributable to his handicap. We know that is not so. *Maher*, 793 F.2d at 1482. TUSD asserts that this passage is not *dicta* because the Supreme Court significantly left it undisturbed on appeal. TUSD also argues that in addition to the *Maher* plaintiffs' entitlement regarding the particular discipline at issue, the district court below made expansive rulings that affected all discipline administered to the plaintiffs, whether related to their disability or not. According to TUSD, the broadly stated declaratory judgment and injunction was expressly acknowledged by the Court of Appeals. *Id.* at 1479. Finally, TUSD notes that the Ninth Circuit framed the issues on appeal and stated in relevant part:

> (2) Under no circumstances may handicapped children be subjected to a *total* cessation of educational services, even for misbehavior that is not handicapped-related.

*Id.* at 1480–81 (emphasis in original).

The Court cannot agree with TUSD's position. The district court in *Maher* did not consider the issue of the cessation of educational services to students who were expelled for conduct unrelated to their disability. *That* issue was not before it. It is true that the *Maher* district court included some language in the original declaration of rights which is to the contrary: "Plaintiffs ... 5. shall not be denied or totally expelled or excluded from having any educational services whatsoever provided by the SFUSD." *Maher*, 793 F.2d at 1496 (Appendix A: district court judgement of December 2, 1983). It was ordered that "Defendants are permanently enjoined from referring plaintiffs for disciplinary proceedings with the exception

of 5–schoolday suspensions...." *Id.* at 1498. Finally, the district court declared that California student discipline statutes "relating to expulsion, and any state or local administrative regulation of policy promulgated pursuant thereto applied to plaintiffs as handicapped students violates the EAHCA and § 504." *Id.* at 1500. These broad declarations could be construed as applying to all expulsions of exceptional children whether or not related to the handicapping condition. The district court, however, recognized the apparent conflict and on a motion for reconsideration expressly declined to extend *Maher* to situations such as the one at issue today:

> Defendants have requested a further clarification of this court's orders, suggesting they are inconsistent at least insofar as one of the orders approves a statement of policy adopted by the state defendants pursuant to an earlier court order. The purported inconsistency they ask the court to resolve is one this court has already declined to resolve. That issue is *whether expulsion, suspension or other disciplinary action may be taken with respect to handicapped children whose misconduct is not a manifestation of their handicap.*
>
> *The Court once again declines the invitation. It was and remains unnecessary to reach this issue in this case.* In each of the instances before this court the disciplinary action was taken in response to behavior that arose out of the handicap. *There is no set of facts before the court that justifies expanding the analysis to conduct which is not a manifestation of the handicap.*

*See* November 13, 1984 "Further Order Re Defendant's Request for Clarification" attached to Brief of United States as *amicus curiae* ("U.S.Brief"), Attachment 1 (emphasis added)..

■ Additionally, a court may grant declaratory judgment relief only on issues immediately before it and may not render an "advisory decree upon a hypothetical state of facts." *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 325, 56 S.Ct. 466, 473, 80 L.Ed. 688 (1936); Fed.R.Civ.P. 57 (Declaratory Judgments—Advisory Note "all

parties having an interest therein or adversely affected must be made parties or be cited"). Since the Magyars' situation was not before the *Maher* district court, that court could not expand the reach of its declaration beyond the facts at hand. The district court's later clarifying order made clear that its rulings only applied to handicap-related misconduct.

Since the issue before the district court, and subsequent appeal concerned students who were disciplined for conduct *related* to the disability, the Ninth Circuit's observations on the effect of the IDEA on students who are disciplined for conduct *unrelated* to the disability was not essential to the outcome of the *Maher* case. The Ninth Circuit, therefore, may not have fully considered the issue through adequate briefing and discourse.

For instance, *Maher* was decided eleven years ago and did not have the benefit of the Department of Education's recent interpretations. Nor did the decision involve the interpretation of Arizona law. Given the complexity of the issue at bar, the contested *Maher* passages provide no analysis which would be helpful to this Court.

More important, a federal court's jurisdiction is limited by the case or controversy before it. If the *Maher* passages were determined not to be dicta, then they would be binding on parties not before it. For these reasons, this Court concludes that the passages in the *Maher* opinion are *dicta* and shall not be given controlling weight. Even if the Court were to decide *Maher* has precedential value, this case is distinguishable by the constitutional significance Arizona places on education. *see* Section VII, *infra.*

Finally, the Court questions whether the challenged *Maher* passages remained untouched by the *Honig* decision. Significantly, the Supreme Court declined to read into the IDEA an "emergency exception for dangerous students." *Honig* concluded "that the omission was intentional; we are therefore not at liberty to engraft onto the statute

and exception Congress chose not to create." *Id.* An exception, TUSD seeks to this Court to adopt today.

### C. *Scope of IDEA and Congressional Intent*

The Court now turns to the issue of whether a school district accepting federal funds is permitted under the IDEA to deny educational services to a child with a disability who has been expelled from school for misconduct found to be unrelated to the handicapping condition. Plaintiffs contend that a school district must provide children with disabilities a free and appropriate education without exception. They argue that the plain language and remedial purposes of the IDEA, congressional intent and sound educational policy demands this conclusion. Plaintiffs also assert that this Court should defer to the Office of Special Education Programs ("OSEP") formal opinion that educational services for such students must be continued.

In contrast, TUSD asserts that nothing in the IDEA or the legislative history supports such a conclusion that Congress intended to create a "super" class of disabled students. According to TUSD, the OSEP's interpretive rules do not have the force and effect of law and should not be accorded weight in the adjudicatory process. TUSD maintains that its discipline policy comports with *Maher* and does not violate the IDEA.

### D. *Individuals with Disabilities Act* [2]

The IDEA provides federal funds to assist state and local agencies in educating children with disabilities. Federal funding is conditioned upon a commitment from each participating state that all children with disabilities within its jurisdiction will receive necessary educational services in accordance with the Act. 20 U.S.C. § 1412. The primary purpose of the IDEA is "to assure that all handicapped children have available to them ... a free and appropriate public education which emphasizes special education and related ser-

---

**2.** The Education of the Handicapped Act of 1975 was later renamed by Congress in 1990 to the "Individuals with Disabilities Act." *See* Pub.L. 101–476, § 901(a)(1), 104 Stat. 1103, 1141–1142

(1990). The relevant provisions of IDEA are substantively identical to those contained in the original Act passed in 1975.

**1434**

vices designed to meet their unique needs...." 20 U.S.C. § 1400(c). Congress explicitly recognized that "a handicapped child has a right to receive all services normally provided a nonhandicapped child enrolled in a public elementary or secondary school." S.Rep. No. 168, 94th Cong., 1st Sess. 12 (1975), *reprinted* in 1975 U.S.C.C.A.N. 1425, 1436. Congress noted that the United States Supreme Court established the right to an equal opportunity to a free public education in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). *Id.* at 1430. Congress recognized that this right was extended to disabled children in *Pennsylvania Assoc. for Retarded Children v. Pennsylvania,* 343 F.Supp. 279 (E.D.Pa.1972) and *Mills v. Board of Education of District of Columbia,* 348 F.Supp. 866 (D.C.Cir.1972). *Id.*

An appropriate education for disabled students consists of specialized instruction and related services that are provided in conformity with an individualized education program. 20 U.S.C. § 1401(a)(16)-(18). The IEP is a written plan of action created by consensus between the family and the school and summarizes the student's abilities, sets goals for progress and specifies a commitment of resources from the public agency. 20 U.S.C. § 1401(a)(20).

Congress found at the time of the IDEA's enactment that more than half of the eight million handicapped children were not receiving appropriate educational services. 20 U.S.C. § 1400(b). In order to assure that states receiving financial assistance will provide a "free and appropriate public education" for all disabled children, the IDEA establishes a comprehensive system of procedural safeguards designed to ensure meaningful parental participation "in all aspects of a child's education." *Honig v. Doe,* 484 U.S. at 308, 108 S.Ct. at 596.

These procedures include: (1) notifying the parents in writing of the district's intention to seek expulsion, 20 U.S.C. § 1415(b)(1)(C)(i); (2) convening an IEP team meeting to assess the misconduct and the appropriateness of the child's current placement, 20 U.S.C. § 1401(a)(18); 34 C.F.R. § 300.342–.343; (3) conducting an in-

dependent evaluation of the child's educational needs, 20 U.S.C. § 1415(b)(1)(A); 34 C.F.R. § 104.35; (4) informing the parents of their right to demand both impartial administrative review of any IEP team decisions and judicial review of the state's final administrative determination, 20 U.S.C. § 1415(b)(1)(D); and (5) allowing the student to remain in his or her then-current educational placement pending resolution of any previously mentioned review proceedings, unless the parents otherwise agree, 20 U.S.C. § 1415(e)(3). The notice to the parents must explain all procedural rights, describe the proposed action, the basis for the school's decision, other options considered and the reason for their rejection. 20 U.S.C. § 1415(b)(1)(C); 34 C.F.R. § 300.505.

As noted above, the Act has a "stay put" provision. During the pendency of any proceedings initiated under the Act, unless the agency and the parents otherwise agree, "the child shall remain in the then current educational placement." 20 U.S.C. § 1415(e)(3)(A). A suspension longer than ten days, is considered a "change in placement" requiring the above procedural protections. 34 C.F.R. §§ 104.35 and 300.551(a) and (b)(2); *Maher,* 793 F.2d at 1486; *S–1 v. Turlington,* 635 F.2d 342 (5th Cir.1981), *cert. denied,* 454 U.S. 1030, 102 S.Ct. 566, 70 L.Ed.2d 473 (1981). Expulsion constitutes a "change in placement" within the meaning of the Act. *Maher,* 793 F.2d at 1481. Hence, a school district seeking to impose a long-term suspension or to expel a handicapped student must comply with the procedures prescribed by the IDEA with the required parental involvement and endorsement. *Honig,* 484 U.S. at 324, 108 S.Ct. at 604.

### 1. *175 Day Long–Term Suspension Educational Services*

The first step is to determine whether the District complied with the IDEA's procedural requirements. *Union Sch. Dist. v. Smith,* 15 F.3d at 1524. Jeremy's IEP in effect at the time he brought the knife to school, required that he receive special education resource services for 80% of his school day. Jeremy received a short-term suspension of ten school days (September 21,

1995—October 4, 1995). That suspension did not require a new IEP because it did not constitute a change in placement. *Honig,* 484 U.S. at 325, 108 S.Ct. at 605 (suspensions of less than ten days do not rise to the level of changes in placement).

 On October 11, 1995, however, the District decided to extend Jeremy's suspension for a total of 175 days. The record reflects that no new IEP was noticed or held prior to that decision. Or even shortly thereafter. At that point, the District violated the IDEA because such a long-term suspension represents a change in placement for which a new IEP is required. Although Jeremy worked in the Graffiti Abatement Project, it does not have an educational component much less the individualized instruction his disability required.

 Federal law requires that during the contested proceeding, the student must remain in the current educational program. 20 U.S.C. § 1415(e)(3) (requiring that a student "stay put" in a current educational placement during expulsion proceedings). This right was never afforded Jeremy. Thus, even if the Court were to accept TUSD's position, which it does not, at a minimum, a multidisciplinary IEP conference, new IEP and individualized services should have been provided from the date the long-term suspension began on October 5, 1995 through the date of expulsion on January 23, 1996. Although TUSD offered to allow Jeremy to pick up homework assignments, this did not comport with the IEP. The Court finds that TUSD did not provide Jeremy with any educational services during the entire period of his long-term suspension in violation of 20 U.S.C. § 1415(e)(3)(A); 34 C.F.R. § 104.35(a). In fact, an IEP conference was not held until some five months later in February, 1996. And the purpose of that conference was to determine future services, not present services.

Congress noted that in the school year prior to the passage of the IDEA, the educational needs of 82% of all emotionally disabled children were unmet. *Honig,* 484 U.S. at 309, 108 S.Ct. at 597 (citing S.Rep. No. 94–168, at 8 (1975), U.S.C.C.A.N. at 1425, 1432). Here too, Jeremy wasted a semester scrubbing paint off buildings rather than devoting his time to improving his subpar academic and behavioral skills. The very danger the IDEA hopes to eliminate, TUSD fosters with its long-term suspension policy.

### 2. *Post-Expulsion Educational Services*

First, the Court reiterates that the issue is not whether TUSD can expel a student for serious misconduct. Assuming the IDEA's procedural dictates are followed, a school district may discipline that child in the same manner that it would discipline any other child, including suspension or expulsion from the regular school setting. The issue here, is narrower. Rather, it is whether a school district must provide the IDEA-qualified student educational services during the expulsion period. Under the second prong of the *Smith* analysis, the question is, whether TUSD was required to meet the substantive component of the IDEA—the requirement that it provide an "appropriate" education for Jeremy.

TUSD's Governing Board Policy # 5061 permits the termination of educational services for children with disabilities following a decision that the student's misconduct is not related to the disabling condition. TUSD asserts that since it has no obligation to educate an expelled child, it cannot be faulted for its failure to provide Jeremy alternative educational services as Plaintiffs desire.

TUSD argues that the primary goal of the IDEA is to guarantee disabled children an equal opportunity to receive the free appropriate public education enjoyed by their non-disabled peers. S.Rep. No. 168, 94th Cong., 1st Sess. 12 (1975), *reprinted in* 1975 U.S.C.C.A.N. 1425, 1436 ("a handicapped child has a right to receive all services normally provided a nonhandicapped child enrolled in public elementary or secondary school"). According to TUSD, Congress explicitly assumed responsibility for "equal protection of the laws to guarantee that handicapped children are provided equal educational opportunity." *Id.* at 1433. TUSD argues that the legislative history of the Act does not indicate that Congress intended to elevate the needs of disabled children above

those of nondisabled children. According to the District, its policy is a nondiscriminatory disciplinary policy which does not run contrary to Congress' express position that "the right to a free appropriate public education is basic to *equal* opportunity." *Id.* at 1433 (emphasis added).

The IDEA requires participating school districts to have in effect a "policy that assures all handicapped children the right to a free and appropriate public education," 20 U.S.C. § 1412(1), and to educate "all children residing in the State who are handicapped, regardless of the severity of their handicap." 20 U.S.C. § 1412(2)(C). TUSD argues that based on section 1412(1), the emphasis is on "the right to" a free and appropriate education. In contrast, Plaintiffs contend that nothing in the statute suggests an exception based on the particular disciplinary policies of the individual school districts. Plaintiffs assert that the IDEA's liberal use of "all" when it refers to handicapped children coupled with no exceptions, mandates the conclusion that educational services must be provided to disabled students. Period.

Answering the question of whether a disabled student may be excluded from educational services for non-handicapped related misconduct is not simple. United States Circuit Courts of Appeal, States and the United States Department of Education are aligned on various sides of the debate. Recently the Fourth Circuit wrestled with this question, first siding with the Magyars' position and then reversing itself to align itself with the position taken by TUSD.

The Fourth Circuit case arose when pursuant to the requirements of the IDEA, Virginia submitted to the OSEP, its IDEA plan for fiscal years 1993–95. The plan was conditionally approved and Virginia received funding for 1993. The Department of Education subsequently learned that Virginia had a policy in effect which allowed educational services to cease for those disabled students who were expelled or suspended long-term for behavior unrelated to their disabilities. The Department of Education threatened to withhold Virginia's entire $60 million annual IDEA grant for fiscal years 1994 and 1995 unless Virginia amended its policies to pro-

vide private educational services to 126 disabled students who had been expelled under the Virginia policy. Virginia refused to amend the policy and petitioned the Fourth Circuit Court of Appeals for interlocutory review.

The Fourth Circuit ordered the Secretary of Education to conduct an evidentiary hearing. *See Virginia v. Riley*, 23 F.3d 80 (4th Cir.1994) ("*Riley I*"). After hearing, the Secretary issued a final ruling providing that unless Virginia amended its disciplinary policy to allow educational services for all disabled students regardless of whether the misconduct was related to the handicapping condition, federal funding under the IDEA would cease. Once again, Virginia appealed. The Fourth Circuit affirmed the Department of Education's construction of the IDEA and the Secretary's ruling. *See Virginia v. Riley*, 86 F.3d 1337 (4th Cir.1996) ("*Riley II*"). Judge Luttig dissented. *Id.* at 1347–58. On October 11, 1996, the court granted Virginia's petition for rehearing en banc.

After review of the records, briefs and further oral argument, the Fourth Circuit adopted as their own, Judge Luttig's dissent which in effect reversed the Department of Education. *See Virginia v. Riley*, 106 F.3d 559 (4th Cir.1997) ("*Riley III*"). Citing the clause that the States "ha[ve] in effect a policy that assures all children with disabilities the right to a free appropriate public education," 20 U.S.C. § 1412(1), Judge Luttig found that the disabled student's "right to" a free and appropriate education could be forfeited by non-handicapped related misconduct. *Id.* at 568–69. To reach this conclusion, Judge Luttig applied the Supreme Court's "clear statement rule" to find the IDEA ambiguous. *See Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981) (holding that "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously"). Judge Luttig found that:

it is apparent that Congress has not spoken through the IDEA with anywhere near the clarity and the degree of specificity required for us to conclude that the State's receipt of special education funds is conditioned upon their continued provision

of education to handicapped students expelled for criminal activity or other misconduct unrelated to their disabilities.

*Riley III* at 567. Judge Luttig then held that the:

> better interpretation of the statutory language is that Congress only required the States to provide handicapped children with access to an education, reserving to the States—intentionally or otherwise— the authority to discipline handicapped students as they deem appropriate, for criminal actions and misconduct unrelated in any way to those students' disabilities.

*Id.* Judge Luttig also applied a Tenth Amendment analysis to find that if the Department of Education's interpretation was correct, it amounted to a financial inducement so coercive as to be violative of the Tenth Amendment. *Id.* at 571–72. Judge Luttig concluded that "disabled students like non-disabled students, can forfeit by criminal activity or serious misconduct unrelated to their disability" the right to a free and appropriate education. *Id.* at 568.

Circuit Judges Murnaghan and Hall filed separate dissents. Judge Murnaghan found that the majority's decision invented an unmentioned forfeiture exception to justify interpreting "all children" so as to exclude disabled children who are suspended or expelled for misconduct unrelated to their disabilities. *Id.* at 572–73 (Murnaghan, J., dissenting). To Judge Murnaghan, "all means all" and that the focus should be on "free appropriate public education." *Id.* at 575. Judge Murnaghan reviewed the legislative purpose and requirements of the IDEA to conclude that the "IDEA's plain language leaves no room for exceptions of the kind that Virginia has asked us to read into it." *Id.* at 579.

Judge Hall joined Judge Murnaghan's dissenting opinion but also wrote that on this issue the Department of Education's interpretation should be afforded judicial deference. *Id.* at 580 (Hall, J., dissenting). Judge Hall found that the majority invoked the pre-*Chevron*, "clear statement rule." After discussing why the "clear statement rule" was unworkable, Judge Hall concluded that where a statute in question is ambiguous, which the majority of the court apparently assumed that it was, the courts should defer to the agency's reasonable interpretation. *Id.* at 581–82 (citing *Chevron, U.S.A., Inc. v. Natural Resources Defense,* 467 U.S. 837, 866, 104 S.Ct. 2778, 2793, 81 L.Ed.2d 694 (1984).

The Fifth, and Sixth Circuits have concluded that the expulsion of a handicapped student constitutes a change in placement and that there may not be a complete cessation of educational services. *Turlington,* 635 F.2d at 350; *Kaelin v. Grubbs,* 682 F.2d 595, 602 (6th Cir.1982). The Seventh Circuit in *Metropolitan School District of Wayne Township v. Davila,* 969 F.2d 485 (7th Cir.1992), *cert. denied,* 507 U.S. 949, 113 S.Ct. 1360, 122 L.Ed.2d 740 (1993) held that the OSEP's rule was interpretive and thus, exempt from the notice and comment procedures of the Administrative Procedure Act. *Id.* at 494. In reversing the district court, the Seventh Circuit recognized that "[s]imply because a reviewing court disagrees with an agency interpretation does not render it legislative." *Id.* The school district in *Davila* had not challenged the agency's underlying decision. At issue, then, was only OSEP's authority to issue its interpretation, not the interpretation itself.

Against this backdrop, the Court finds that based on facts unique to this case and the Supreme Court's guidance in *Honig,* that all handicapped students are entitled to individualized educational services when they are long-term suspended or expelled from the regular school setting in the State of Arizona.

 The Court reaches this decision first based on Congress's recognition that handicapped children have exceptional needs which must be met if they are to be full participants in society. Statistics compiled by Congress estimated that of eight million disabled children in the United States, 1.75 million were excluded from public schools and 2.5 million were receiving an inappropriate education. S.Rep. No. 168, 94th Cong., 1st Sess. 8 (1975), *reprinted in* 1975 U.S.C.C.A.N. at 1432. Legislators were particularly mindful that children with emotional or behavioral difficulties were routinely ex-

cluded from the classroom and intended the IDEA to have a broad remedial effect. *Id.* at 1433. Congress explicitly relied on two district court cases to guide them in drafting the IDEA: *Pennsylvania Association for Retarded Children v. Pennsylvania,* 343 F.Supp. 279 (E.D.Pa.1972) and *Mills v. District of Columbia Bd. of Educ.,* 348 F.Supp. 866 (D.C.Cir.1972). S.Rep. No. 168 at 6, U.S.C.C.A.N. at 1430. These cases both "involved the exclusion of hard–to–handle disabled students." *Honig,* 484 U.S. at 324, 108 S.Ct. at 604; *see also* S.Rep. No. 168, 94th Cong., 1st Sess. 6 (1975), *reprinted in* U.S.C.C.A.N. at 1430. The Supreme Court has recognized the importance of these two cases to the drafters of the IDEA: "The fact that both *PARC* and *Mills* are discussed at length in the legislative Reports suggests that the principles which they established are the principles which, to a significant extent, guided the drafters of the Act." *Rowley,* 458 U.S. at 194, 102 S.Ct. at 3044. *Rowley* found that the "major principles" of these "right to education" cases were incorporated into the IDEA. *Id. Mills,* in particular, stands for the proposition that no child with a disability is too retarded, too disturbed, or too much of a behavior problem, to be excluded from or denied a public education. *Mills,* 348 F.Supp. at 875. Indeed, among the most poorly served were the emotionally disturbed children. *Honig,* 484 U.S. at 309, 108 S.Ct. at 597.

Congress's specific findings were that:

(1) there are more than eight million handicapped children in the United States today;

(2) the special educational needs of such children are not being fully met;

(3) more than half of the handicapped children in the United States do not receive appropriate educational services;

(4) one million of the handicapped children in the United States are excluded entirely from the public school system and will not go through the educational process with their peers;

(5) there are many handicapped children throughout the United States participating in regular school programs whose handicaps prevent them from having a success-ful educational experience because their handicaps are undetected;

(6) because of the lack of adequate services within the public school system, families are often forced to find services outside the public school system, often at great distance from their residence and at their own expense;

(7) developments in the training of teachers and in diagnostic and instructional procedures and methods have advanced to the point that, given appropriate funding, State and local educational agencies can and will provide effective special education and related services to meet the needs of handicapped children;

(8) State and local educational agencies have a responsibility to provide education for all handicapped children, but present financial resources are inadequate to meet the special educational needs of handicapped children; and

(9) it is in the national interest that the Federal Government assist State and local efforts to provide programs to meet the educational needs of handicapped children in order to assure equal protection of the law.

20 U.S.C. § 1400(b)(1)–(9). The Court finds no exception for misbehaving handicapped children. The state purpose of the IDEA is "to assure that *all* handicapped children have available to them … a free and appropriate special education…." 20 U.S.C. § 1400(c). Again, Congress made no exception for misbehavior. Indeed the Supreme Court thought it clear:

Congress very much meant to strip schools of the unilateral authority they had traditionally employed to exclude disabled students, particularly emotionally disturbed students, from school. In doing so, Congress did not leave school administrators powerless to deal with dangerous students; it did however, deny school officials their former right to 'self-help' and directed that in the future the removal of disabled students could be accomplished only with the permission of the parents or, as a last resort, the courts.

*Honig,* 484 U.S. at 323–24, 108 S.Ct. at 604. The Supreme Court declined the invitation to "rewrite the statute" to read a "dangerousness" exception into the IDEA. *Id.* at 323, 108 S.Ct. at 604. Thus, it is apparent that Congress intended all children with disabilities to receive an appropriate education, including those who are discipline problems.

Moreover, there is nothing in the statute or the legislative history to suggest that an exception exists based on the disciplinary policies of individual school districts. Indeed, the title of the Act sets the tone "The Education for *All* Handicapped Children Act." 20 U.S.C. § 1400 *et seq.* (emphasis added). In fact, the IDEA's liberal use of the word "all" is clear and unequivocal and should not be ignored. Some examples: The IDEA requires that for a state to qualify for financial assistance, it must have "in effect a policy that assures *all* handicapped children the right to a free appropriate education." 20 U.S.C. § 1412(1) (emphasis added). The state must "set forth in detail the policies and procedures which the State will undertake ... to assure that—there is established a goal of providing full educational opportunity to *all* handicapped children ..., [and that] a free appropriate public education will be available for *all* handicapped children between the ages of three and eighteen ... not later than September 1, 1978, and for *all* handicapped children between the ages of three and twenty-one not later than September 1, 1980...." 20 U.S.C. § 1412(2)(A) and (3) (emphasis added). The state must also assure that *"all* children residing in the State who are handicapped regardless of the severity of their handicap, and who are in need of special education and related services are identified, located, and evaluated...." 20 U.S.C. § 1412(2)(C) (emphasis added); *see also* 20 U.S.C. § 1414(a)(1)(A).

The duties of the Secretary include the evaluation of "the effectiveness of State efforts to assure the free appropriate public education for *all* handicapped children" and the requirement to transmit "a report on the progress being made toward the provision of free appropriate public education to *all* handicapped children." 20 U.S.C. § 1418(a) and (c) (emphasis added). With reallocation of funds, the IDEA provides that "whenever a State educational agency determines that a local educational agency is adequately providing a free appropriate public education to *all* handicapped children ... [it] may reallocate funds...." 20 U.S.C. § 1414(e) (emphasis added). The Court is mystified as to find the exception proffered by TUSD and *Riley III.* In the words of Circuit Judge Murnaghan, this Court agrees, "all means all." *Riley III,* 106 F.3d at 574–75 (Murnaghan, J., dissenting).

## V. *Deference to the Agency*

■ Where the language of a statute is clear, the court "must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781. Assuming *arguendo,* that the statute is ambiguous and the intent of Congress unclear, "the court does not simply impose its own construction on the statute as would be necessary in the absence of administrative interpretation." *Id.* at 843, 104 S.Ct. at 2782. Rather, it must accord considerable weight to an agency's construction if it is a reasonable one. *Id.*

The United States Department of Education Office of Special Education Programs (" OSEP") is the federal agency charged with the administration, interpretation and enforcement of the IDEA. OSEP's interpretation is that the IDEA requires the continuation of services to students with disabilities following long-term suspension or expulsion. 20 U.S.C. § 1402, 1416, 1417; *Letter to Johnston,* 20 IDELR 1468, 1470 (OSEP 1994) ("Under Part B, even during a disciplinary removal that exceeds 10 school days, schools may not cease education services to students with disabilities. This is regardless of whether the student's misconduct is determined to be a manifestation of the student's disabilities."); *see also Letter to Feinstein,* 21 IDELR 1134 (OSEP 1994); *Letter to Boggus,* 20 IDELR 625 (OSEP 1993); *Letter to Taylor,* 20 IDELR 542 (OSEP (1993); *Letter to Byrd,* 19 IDELR 977 (OSERS 1993); *Letter to Smith,* 18 IDELR 685 (OSERS 1992); *Letter to Symkowick,* 17 EHLR 469 (OSERS 1991); *Letter to Davis,* 16 IDELR 734 (OSEP 1990); *Letter to New,* 13 EHLR

213:258 (OSEP 1989). As recently as April 1995, OSEP has reaffirmed its policy that "in order to meet the [free appropriate public education] requirements of IDEA, educational services must continue for students with disabilities who are excluded from misconduct that was not a manifestation of their disability during periods of disciplinary removal that exceed ten days." *OSEP Memorandum 95–16*, 22 IDELR 531, 536 (OSEP 1995).

■■■ An agency's interpretative statements such as that espoused by OSEP, commands heightened respect. *Metropolitan Sch. Dist. of Wayne Township v. Davila*, 969 F.2d 485 (7th Cir.1992), *cert. denied*, 507 U.S. 949, 113 S.Ct. 1360, 122 L.Ed.2d 740 (1993) (reversing district court determination that the policy statement is a legislative rule triggering the notice and comment procedures of the APA). Congress expressly directed the Department to "widely disseminate" its policy with respect to disciplining children with disabilities. *See* 20 U.S.C. § 8923(1). As the Supreme Court noted in *Honig*, with any ambiguity, this Court should defer to the construction adopted by the agency charged with monitoring and enforcing the statute. *Honig*, 484 U.S. at 325 n. 8, 108 S.Ct. at 605 n. 8.

TUSD is well aware of OSEP's interpretation because it personally sought an opinion on the case at bar. The United States Department of Education responded to an inquiry posed by TUSD legal counsel, Ruth B. Davis, regarding the force of the *Maher* decision. Assistant Secretary Robert Davile stated that it was the agency's conclusion that the *Maher* statements with regards to providing services for nondisability related misconduct were *dicta*. *Letter to Davis*, 16 IDELR 734 (OSEP 1990). Davile emphasized that his office expects states within the Ninth Circuit are to comply with OSEP's directive regarding the continuation of services. *Id.* A school district "must either comply with the Department's interpretation or face potential sanctions." *Metropolitan*, 969 F.2d at 489. It is clear to the Court that TUSD knowingly denied Jeremy's educational services at its peril.

■■■ Based on the foregoing, the Court concludes that TUSD violated the IDEA in fact, and in spirit. TUSD did hold an IEP conference in February, 1996. No alternative placements, however, were developed as required by the IDEA. No written notice as required by 34 C.F.R. § 300.345 was provided to Jeremy's parents. Although, the District made attempts to reach Mr. Magyar by phone, that does not relieve it of its duty to provide an appropriate public education. *Smith*, 15 F.3d at 1524 (failure of parents to accept offer does not relieve the district of its obligation to provide a free appropriate public education); *Abney by Kantor v. District*, 849 F.2d 1491, 1496 (D.C.Cir.1988) (a disabled student's change in placement for non-educational reasons did not exonerate the responsible district from its obligations under IDEA to continue a free appropriate public education and to comply with the procedural requirements of the Act). Indeed, a meeting can be held without parental participation if the district maintains "a record of its attempts to arrange a mutually agreed on time and place." 34 C.F.R. § 300.345(d). TUSD did not submit any such evidence.

### VI. Gun-Free Schools Act of 1994

The Gun–Free Schools Act of 1994 is additional evidence of congressional intent to provide an appropriate education to all handicapped children. The Act requires that each state receiving federal funds must have in effect a state law requiring expulsion from school for not less than one year of a student who brings a weapon to campus. 20 U.S.C. § 8921(b)(1); A.R.S. § 15–841(G). A weapon is defined as a "firearm." 20 U.S.C. § 8921(b)(4).

■■■ Congress in writing the final guidance concerning state and local responsibilities under that Act, determined that children with disabilities who are removed from school for possessing firearms on campus, must be provided with alternative programming during the time of the disciplinary exclusion. *See* Guidance Concerning State and Local Responsibilities Under the Gun–Free Schools Act of 1994, 140 Cong. Rec. § 10017 (daily ed. July 28, 1994). The school retains

the discretion to modify the expulsion requirement on a case-by-case basis. 20 U.S.C. § 8921(b)(2). The Gun–Free School's Act specifically states that its provisions must be construed in a manner consistent with the IDEA. 20 U.S.C. § 8921(c). Additionally, as part of the same legislation, Congress amended the IDEA to permit children with disabilities who bring firearms to school, to be "placed in an interim alternative educational setting" for up to 45 calendar days. 20 U.S.C. § 1415(e)(3)(B)(i). If the parents request an administrative hearing, the student must remain in the interim placement until the completion of all proceedings, unless the parents can agree otherwise. *OSEP Memorandum 95–16,* 22 IDELR 531, 536–37 (OSEP 1995).

At the time of the passage of the Act, Congress was well aware of the Department's interpretation regarding long-term suspension or expulsion. It apparently has chosen not to modify the IDEA's requirement that states assure to "all" children with disabilities the right to a free and appropriate public education.[3] Section 314(b) of the Improving America's Schools Act of 1994, Pub.L. 103–382, 108 Stat. 3907 (1994), codified at 20 U.S.C. § 8921 note, indicates that its provision dealing with the discipline of children who bring guns to school "shall be interpreted in a manner that is consistent with the Department's guidance" regarding the implementation of the Gun–Free School's Act, Pub.L. 103–227, 108 Stat. 270 (1994). Moreover, The Act requires the Secretary of Education to "widely disseminate the policy of the Department in effect on October 20, 1994 with respect to disciplining children with disabilities". 20 U.S.C. § 8923(1).

Both measures direct school districts to provide special education services during the time of disciplinary removal in accordance with the IDEA. There is no logical basis from which to conclude that Congress intended to grant children with firearms a right different from other groups of disabled students. These recent legislative actions, taken with consistent reliance upon the IDEA,

offer further proof that TUSD may not discontinue educational services as part of its response to serious misconduct.

### VII. *Fundamental Right to Education in Arizona*

TUSD argues that requiring alternative educational services for handicapped students who misbehave will create a "super class" of pupil who will be given rights not afforded to regular education students. This argument fails for two reasons.

First, it is a myth that schools treat all students equally. Many programs are designed to meet the needs of a particular segment of the student body. Schools regularly provide special classes for the musically talented or athletically inclined or for those who qualify for advance placement courses. These programs discriminate on the basis of ability and not available to all students as a matter of course.

With the handicapped child, the right to educational services is based on legislative act. The IDEA, itself, provides more than equal access to public schools for children with disabilities. With the enactment of the IDEA, Congress recognized that disabled children require greater services and protections to have meaningful educational opportunities. Unlike their nondisabled peers, students with disabilities receive specialized instruction under individual educational plans formulated by a multidisciplinary committee. 20 U.S.C. §§ 1401(a)(2) and 1414(a)(5). These students may receive year round schooling, private education at public expense, tutors, note takers and or full time aides. *See, e.g.,* 34 C.F.R. §§ 300.302, .306, .308. These services are not provided to regular education students. The IDEA's "stay put" provision where a handicapped child is allowed to remain in his or her present education setting pending appeal, is but another example where handicapped children are afforded more rights than their non-disabled peers. *See* 20 U.S.C. § 1415(e)(3)(A). Moreover, where Congress intended IDEA's coverage to vary according

---

**3.** The Act has been amended on several occasions since the Department first announced its interpretation of the statute's requirements on

this issue: in 1990, *see* Pub.L. 101–476; in 1991, *see* Pub.L. 102–119, and in 1994, *see* Pub.L. 103–382.

to state practice, it was capable of saying so. cf. 20 U.S.C. § 1412(2)(B) (providing that statute's coverage of disabled children aged three to five and eighteen to twenty-one is dependent on state practice regarding education of these age groups generally).

More important, Article XI §§ 1, 6 of the Arizona Constitution establishes education as a fundamental right of students between the ages of six and twenty-one years. *Shofstall v. Hollins,* 110 Ariz. 88, 515 P.2d 590, 592 (Ariz.1973).[4] Although *Shofstall* established this right, it applied the rational basis test to uphold the then-existing school financing scheme. *Id.,* 515 P.2d at 592–93. Recently, the Arizona Supreme Court *rejected Shofstall's* use of the rational basis test. *Roosevelt Elementary School Dist. v. Bishop,* 179 Ariz. 233, 238, 877 P.2d 806, 811 (Ariz.1994). *Roosevelt* held that in such instances "courts must apply a strict scrutiny analysis to fundamental rights and uphold challenged laws *only* if the inequality resulting from their application is essential to serve a compelling state interest." *Id.* At stake here, is a school district's policy, not a questionable state law. Under such scrutiny, though, TUSD's policy fails.

TUSD's argument is that it desires to provide a safe environment conducive for learning; students who bring weapons to school forfeit that opportunity. One of the main purposes of education is to educate youngsters so that they grow to be productive members of society. TUSD's long-term suspension and expulsion policy does not further that goal. Students who drop out of school are often those who have been suspended. *See* Pedro Reyes, *Factors that Affect the Commitment of Children at Risk to Stay in School, in Children at Risk* 45, at 18, 23 (Joan M. Lakebrink ed.1989). Dropping out of school is associated with increased criminal activity, drug use, public assistance, unemployment and lower earning capacity.

*See* Terence P. Thornberry *et al., The Effect of Dropping Out of High School on Subsequent Criminal Behavior, 23* Criminology 3, 7 (1985). It is well established that getting a high school education is crucial to survival. *See Lee v. Macon Bd. of Educ.,* 490 F.2d 458, 460 (5th Cir.1974).

When the suspended or expelled child is handicapped, the impact is even greater. Congress, itself, recognized the immense social cost of denying education to children with disabilities. "With proper education service, many [children with disabilities] would be able to become productive citizens, contributing to society instead of being forced to remain burdens." S.Rep. No. 168, 94th Cong., 1st Sess. 9 (1975), *reprinted in* 1975 U.S.C.C.A.N. at 1433. "Others, through such services, would increase their independence, thus reducing their dependence on society." *Id.*

Children with disabilities often have greater difficulty with retention and tend to lose more of what they have learned when educational services are discontinued. Denying such children educational services increases the likelihood that the child will drop out of school permanently. This is especially true of children with emotional disabilities. *See* Jane Knitzer *et al., At the Schoolhouse Door: An Examination of Programs and Policies for Children with Behavioral and Emotional Problems* (1990). Research has shown that the projected lifetime outcomes for students with disabilities across a range of post-school indicators of success such as employment and independent living are consistently worse "than those for students with disabilities." The statistics become all the more bleak for students with disabilities who are suspended or expelled. *See In re State of Virginia, 22* IDELR at 477 (citing the National Longitudinal Transitional Study of Special Education Students). TUSD's policy is successful at removing these students from its school rolls.

---

**4.** In *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), the Supreme Court held that education is not a fundamental right protected by the United States Constitution. A state court, however, is free to interpret its state constitution differently from the Supreme Court's interpretation of the Constitution. *See* Advisory Commission on Intergovernmental Relations, *State Constitutions in the Federal System 49,* 12 (1989); *Union School Dist. v. Smith,* 15 F.3d at 1524 ("state standards that impose a greater duty to educate if they are not inconsistent with federal standards, are enforceable in federal court under IDEA").

It is also successful at returning emotionally disturbed youngsters like Jeremy to the status of underclass citizenry denounced by Congress. Unless these children quickly find their way into the criminal justice system, they do not go away. They often end back on campus as unauthorized trespassers. This does not serve TUSD's nor society's goals. As Judge Murnaghan noted, the "public will suffer from the denial of a free and appropriate education in the case of a child already handicapped." *Riley III,* 106 F.3d at 573 (Murnaghan, J., dissenting).

The Court concludes that when a fundamental right is implicated, denying educational services during long-term expulsion or expulsion when the misconduct is unrelated to the disability cannot survive strict scrutiny analysis. Nothing in this decision should be construed to mean that schools cannot discipline any student for misbehavior. Rather, providing alternative educational services under an individualized educational plan is a more precisely tailored means of attaining Arizona's educational goals. It maintains peace in the school and avoids impinging on the handicapped student's fundamental right to an education.

Indeed, the Arizona Department of Education's policy is to comply with OSEP's interpretation of the statute. Superintendent of Public Instruction, Lisa Graham Keegan, in responding to an inquiry by the OSEP, assured the agency that the:

Arizona Department of Education is aware of the position that has been taken by OSEP relative to continuation of educational services for students with disabilities who are long-term suspended or expelled for misconduct which has been determined not to be a manifestation of their disability, and *has accepted its responsibility to communicate OSEP's position to all of the local education agencies and state supported institutions* responsible for education services for students with disabilities throughout the state.

Post–Hearing Index, Exhibit F, p. 1 (emphasis added). She further promises that the policies of the local educational agencies and state-supported institutions are "not inconsistent with OSEP's interpretation of Part B requirements." *Id.* at p. 2.

The IDEA and Arizona's Constitution does not permit the complete cessation of educational services. The expelled child must continue to receive appropriate educational services in some alternative setting. These services must be provided free of charge to the handicapped child. *See S–1 v. Turlington,* 635 F.2d at 344 (refusing to permit cessation of educational services to disabled children who have been properly expelled for conduct unrelated to their disabilities); *Kaelin v. Grubbs,* 682 F.2d at 601–02 (failure to provide alternative educational services to the expelled handicapped child eviscerates the concept of individualized educational planning).

The Court has carefully considered the expulsion hearing officer's findings and has attempted to respond to them as required by *Town of Burlington v. Dept. of Education,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). In this case, the Court cannot defer to the expulsion hearing officer's decision since it relied solely on the District's policy and ignored the Supreme Court's guidance in *Honig,* OSEP's response to TUSD's legal counsel's inquiry, and *Roosevelt's* clarification of the appropriate standard of review as it relates to education in the State of Arizona.

### VIII. Present Educational Placement

█ Jeremy's present educational placement violates the terms of the IDEA because he is not receiving any special educational services. Jeremy has received such services first as an identified learning disabled student when in elementary school and then as an emotionally handicapped student when in middle school. Index, Item No. 4, Exhibit C. Despite the extensive paperwork such placements naturally generate and contrary to the recent February, 1996 re-evaluation and IEP, TUSD informed the juvenile court that Jeremy was not a special education student. Post–Hearing Index, Exhibit G. Consequently, Jeremy was classified "NSE" or "nonspecial education" for purposes of his Vision Quest Placement. *Id.* at Exhibit H. On November 12, 1996, TUSD wrote Vision Quest and identified him as a student with an emo-

tional disability. *Id.* at Exhibit I. On November 4, 1996, TUSD sent a notice to Steven Magyar explaining that a change in placement was to occur. *Id.* at Exhibit C. The notice explained:

> Jeremy continues to be eligible for special education services as a student with emotional disabilities. He has been placed in a [residential treatment center] by a state placing agency for his care, safety and treatment *and not for educational reasons.*

*Id.* Since TUSD argues, incorrectly, that Jeremy is not a resident of the district, it has not supervised the provision of special education or cooperated in any evaluation with Vision Quest in contravention of A.R.S. § 15–765(E).

Jeremy is currently receiving "general education" as part of Vision Quest's rehabilitation program. *Id.* at Exhibits A, B. He has no current IEP. Steven Magyar is currently bearing a share of the costs for Jeremy's placement with Vision Quest. Mr. Magyar has never been invited to attend a multidisciplinary conference, nor has he been provided a copy or asked to approve Jeremy's educational program. As such, Jeremy is not receiving a free and appropriate education as mandated by the IDEA and its implementing regulations. *See* 20 U.S.C. §§ 1401(a)(18), 1401(a)(20); 34 C.F.R. §§ 300.345, 300.504–.505.

There is no excuse for TUSD's negligence. Even accepting TUSD's position for a moment that Jeremy was not resident of the District, TUSD is required as the home school district to conduct an evaluation or to review the educational placement at Vision Quest. A.R.S. §§ 15–765(E) and 15–761(9). The Court finds that as a direct result of its negligence, Jeremy Magyar is not receiving the special educational services to which he is entitled under the IDEA. The Court will place the burden on the District to take steps to ensure that Jeremy is evaluated and an appropriate IEP implemented.

 This complete failure to provide special education services for this child is unconscionable and Steven Magyar is entitled to an award of compensatory education. *See Parents of Student W v. Puyallup Sch.*

*Dist.,* 31 F.3d 1489, 1497 (9th Cir.1994). Compensatory education is an equitable remedy. *Id.* The Court is unable to determine from the record what specific relief is sought or what would be equitable. Therefore, if Plaintiffs intend to pursue this remedy, they must provide the Court with more information.

### IX. Manifestation Hearing

The Court questions how Jeremy's misconduct which unquestionably involved *behavior* can be found to be unrelated to his emotional handicap. Under the IDEA and state law, a child must be so emotionally handicapped that learning is impaired. 34 C.F.R. § 300.7(b)(9); A.R.S. § 15–761(5). How did TUSD's group of "knowledgeable persons" find that the identified emotional disability did not impede Jeremy's ability to function outside of the classroom as well?

A psychological evaluation conducted in January, 1995 found that Jeremy qualified as an emotionally handicapped student because he exhibits:

(1) an inability to learn which could not be explained by intellectual, sensory or health factors;

(2) an inability to build or maintain satisfactory interpersonal relationships with peers and teachers;

(3) inappropriate types of behavior or feelings under normal circumstances;

(4) a general pervasive mood of unhappiness and depression;

(5) intentionally aloof and shows a strong conduct disorder.

Index, Exhibit C. The evaluating psychologist concluded that these "characteristics have existed for a long period of time, exist to a marked degree and adversely affect educational performance." *Id.,* January 24, 1995, "Corrected Copy Summary of Psychological Evaluation With General Recommendations Tucson Unified School District # 1," p. 4. In other words, Jeremy's disability is chronic.

His psychological evaluations also establish that Jeremy has feelings of abandonment due to his biological mother's absence and his

father's past alcohol abuse. His mother may have locked him in a closet when Jeremy was three. Recently, his father called police and threatened to kill Jeremy and himself. Index, No. 4, Exhibit J; Post–Hearing Index, Exhibit B. He was a ward of the state in 1994 and has lived in several group homes. Index, Exhibit C. Prior to the knife incident he attended five schools in five years. *Id.* He is now presently living with his father and stepmother. Jeremy's evaluation notes that his stepmother was in Palo Verde Hospital during the February 5, 1996 IEP re–evaluation. While attending Gridley Elementary, Jeremy was suspended three times for behavioral problems determined to be unrelated to his handicapping condition. *Id.* His evaluation also noted some expression of "suicidal ideation." *Id.* He has a drug problem and may have been a member of a gang at one time. Index, No. 4, Exhibit J; Post–Hearing Index, Exhibit B. His school attendance is excellent with rare absences. Index, No. 4, Exhibit J.

TUSD urges the Court not to revisit the "knowledgeable group's" finding since Steven Magyar did not appeal that decision. But given the above evaluations of this child, how can a knowledgeable group of educators in good conscience, fairly conclude that the knife incident did not relate to Jeremy's chronic inability to have "satisfactory interpersonal relationships," or to his "inappropriate behavior," or to his "strong conduct disorder?" The more sound conclusion is that Jeremy's IEP in effect at the time of the incident was *not* appropriate. Children with emotional disabilities are impulsive and may have little physical control over their actions. *See* Theresa Glennon, *Disabling Ambiguities: Confronting Barriers to the Education of Students with Emotional Disabilities,* 60 Tenn. L.Rev. 295, 304 (1993). They may have learned "maladaptive responses to social situations." *Id.* That certainly may have been the case with Jeremy. With his history of behavioral problems and suspensions, it's obvious that his emotionally handicapped needs were unmet. What *should have* occurred during the nine day short–term suspension, was a new IEP conference. Surely, it was obvious to Jeremy's teachers, both special and regular, to the school psychologist and to the school administrators, Jeremy's then–current educational program was failing. A central tenet of Jeremy's IEP should have incorporated a treatment program for his behavior problems as well as focused on his poor academic skills.

Moreover, if TUSD's knowledgeable group made any official "findings," the Court was not provided a copy. All that Steven Magyar received from the manifestation hearing was a letter from Dr. Betsy Bounds notifying him that:

> [t]his knowledgeable group decision is based upon a review of his current psychological (1/24/96), a review of his records, and teacher feed back. It is agreed by all group members Jeremy brought the knife knowing that negative consequences would follow and Jeremy can differentiate what the consequences would be if he makes such choices.

Index, Exhibit F. This notice represents only a conclusory statement which the Court finds substantively lacking. Being aware that there are negative consequences, does not mean that a disabled child can control those impulses which ultimately end them up in serious trouble. Without sufficient detail, parents cannot make an informed decision as to whether to appeal or whether an appeal would even be successful. Whenever important interests are at stake, timely and adequate notice detailing the reasons for the proposed action must be given to prevent the occurrence of erroneous decisions. *See Goldberg v. Kelly,* 397 U.S. 254, 267–68, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287 (1970). Thus, even if the Court were to find TUSD Board Policy 5051 satisfactory, this notice given to Steven Magyar was wholly inadequate. The Court also seriously questions that a group of educators can formally meet about the educational future of a handicapped child without seeking parental participation as required by the IDEA. Notwithstanding these observations, the Court's decision today abrogates any need for future manifestation hearings because *all* handicapped students must be provided alternative educational services when long–term suspended or expelled.

### X. Conclusion

**IT IS ORDERED** that based on the preponderance of the evidence Plaintiffs' Motion for Summary Judgment is **GRANTED** and Defendant Tucson Unified School District's Cross Motion for Summary Judgment is **DENIED.**

**IT IS FURTHER ORDERED** that:

(1) Tucson Unified School District violated the rights of Plaintiff Jeremy Magyar as provided under the IDEA when it placed Plaintiff Jeremy Magyar on long-term suspension without providing educational services as required by his IEP;

(2) Tucson Unified School District violated the provisions of the IDEA when it expelled Plaintiff Jeremy Magyar without holding an IEP Conference and implementing an appropriate, alternative educational services;

(3) The expulsion hearing officer's reliance on *Doe v. Maher*, 793 F.2d 1470 (9th Cir. 1986) was clear error and in contravention of the Individual with Disabilities Act, the Arizona Constitution, the Arizona Department of Education policy, and the Office of Special Education Program's reasonable interpretation of the Act;

(4) Tucson Unified School District's Governing Board Policy # 5061 violates the IDEA;

(5) Tucson Unified School District, its agents, employees, successors in office and assigns are hereby permanently enjoined from engaging any actions that would permit the cessation of services for children with disabilities following long-term suspension or expulsion;

(6) Plaintiffs Steven and Jeremy Magyar are entitled to compensatory education;

(7) Plaintiffs are entitled to reasonable attorneys' fees and costs pursuant to 20 U.S.C. § 1415(e)(4)(B); Plaintiffs are directed to file any application for compensatory education and attorneys' fees and costs on or before March 28, 1997; any objection thereto shall be filed April 14, 1997; any reply is due April 25, 1997.

(8) Tucson Unified School District has ten days to ensure that Jeremy Magyar is receiving appropriate educational services in accordance with the IDEA.